Filed 3/17/17

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHARITY FAITH PHILLIPS et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> HONEYWELL INTERNATIONAL INC., <br><br> Defendant and Appellant. | F070761 <br><br> (Super. Ct. No. 12CECG04055) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. Jeffrey Y. Hamilton, Jr., Judge.

Horvitz & Levy, Lisa Perrochet, Robert H. Wright, Curt Cutting; Perkins Coie, Brien F. McMahon and Daniel D. O'Shea for Defendant and Appellant.

Simon Greenstone Panatier Bartlett and Brian P. Barrow for Plaintiffs and Respondents.

-ooOoo-

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, IV, and V of the Discussion.

Defendant Honeywell International Inc. (Honeywell) appeals from a judgment of over $5.8 million awarded to the spouse and surviving children of a man who died of asbestos-related cancer. The jury found the mesothelioma contracted by James Lester Phillips (Phillips) was caused in part by exposure to asbestos contained in Bendix brakes.

Honeywell contends a new trial is warranted because (1) the jury's special verdict was fatally inconsistent; (2) the trial court erroneously refused to give its proposed jury instruction on the factors relevant to causation; and (3) the trial court erroneously admitted prejudicial evidence. Moreover, Honeywell contends judgment should be entered in its favor because the verdict was based entirely on a failure to warn theory that lacked sufficient evidentiary support. If judgment is not entered in its favor, Honeywell contends the $3.5 million award of punitive damages must be reversed because plaintiffs failed to introduce sufficient evidence of malice or oppression.

In the published portion of this opinion, we reject Honeywell's claims of evidentiary error. The trial court properly admitted—subject to a limiting instruction—a 1966 letter of a Bendix employee sarcastically addressing an article in Chemical Week magazine that stated asbestos had been accused, but not yet convicted, as a significant health hazard. The letter is circumstantial evidence relevant to the issue of Bendix's awareness of asbestos's potential to cause cancer. The Illinois and Florida cases holding admission of this letter was prejudicial are distinguishable because they did not include a limiting instruction.

In addition, the trial court properly admitted the testimony of plaintiffs' expert about causation and the contributions to Phillips's risk of cancer from every identified exposure to asbestos that Phillips experienced. In the context of this case, the every-identified-exposure theory is distinguishable from the every-exposure theory and we join courts from other jurisdictions in recognizing that distinction. Furthermore, we conclude the application of every-identified-exposure theory in this case was consistent with

2.

California law addressing proof of causation in asbestos-related cancer cases. Consequently, we need not address the every-exposure theory that the Second District allowed to be presented to the jury in *Davis v. Honeywell Internat. Inc.* (2016) 245 Cal.App.4th 477, review denied May 25, 2016 (*Davis*)[1] and Honeywell's contention that this court should split with *Davis*.

In the unpublished portion of this opinion, we reject Honeywell's other contentions. First, the jury's answers to questions in the special verdict about causation are not inconsistent. Second, the trial court properly rejected Honeywell's proposed instruction about the factors relevant to causation of asbestos-related cancer. Third, as to the sufficiency of the evidence, we conclude there was adequate evidentiary support for the jury's findings that (1) Honeywell was liable under a failure to warn theory and (2) Honeywell's predecessor, Bendix, acted with malice—that is, a willful and conscious disregard of the safety of others. (Civ. Code, § 3294, subd. (c)(1) [definition of malice].)

We therefore affirm the judgment.

## FACTS

### *Bendix and Asbestos*

In 1939, The Bendix Corporation (Bendix) began manufacturing friction products, including automotive brakes, that contained asbestos.[2] Until 1983, Bendix manufactured its brakes using 25 to 50 percent asbestos with other ingredients bound in a resin. In

---

[1] The court in *Davis* concluded that the trial court did not abuse its discretion in allowing the plaintiff's medical expert to present opinion testimony under the every-exposure theory. (*Davis*, *supra*, 245 Cal.App.4th at p. 480.) The court reviewed the commentary and scientific literature cited by the parties, concluded "the theory is the subject of legitimate scientific debate," and stated it was for the jury to resolve the conflict among the competing expert opinions. (*Ibid*.)

[2] "In 1985, Allied Corporation purchased Bendix. Later, Allied Corporation changed its name to Allied Signal, Inc., and in 1999 changed it to Honeywell International, Inc." (*Dukes v. Pneumo Abex Corporation* (2008) 386 Ill.App.3d 425 428 [900 N.E.2d 1128, 1131] (*Dukes*).)

1983, Bendix began offering asbestos-free brakes for some vehicles, but continued to manufacture and sell asbestos-containing brakes until 2001.

Bendix operated a manufacturing facility in Troy, New York. By 1944, Bendix had installed a ventilation system at the facility to assist in the removal of dust. Also, duct work was hooked up to grinding machines to remove the grinding dust from the workplace. Sometime during the 1950's, Bendix began giving employees at the facility annual chest x-rays.

In 1956, New York's Department of Labor adopted regulations setting a maximum allowable concentration for airborne asbestos at 5 million particles per cubic foot. These regulations applied at Bendix's Troy plant.

In March 1966, the New York Times published an article titled, "Asbestos Dust Called a Hazard To at Least One-Fourth of U.S." The title's reference to a quarter of the pollution was described as a preliminary finding by Dr. Irving J. Selikoff, who announced the establishment of an environmental health laboratory at Mount Sinai Hospital to further investigate the dangers of asbestos and other contaminants. The article mentioned Dr. Selikoff's finding of a link between cancer and asbestos in asbestos workers and his belief that the dangers extended to contiguous trades, such as construction workers. The article also stated that asbestos was used in fireproof materials, asphalt tile, dental cement, brake linings, beer filters, gas masks and paper.

Later in 1966, the publication of *Asbestos: Awaiting 'Trial'* (Sept. 10, 1966) Chemical Week, at page 32 caused E. A. Martin, director of purchases at Bendix's Troy facility, to write a now-infamous letter to Bendix's asbestos supplier (Martin letter). The letter was dated September 12, 1966, and addressed to Noel Hendry of Canadian Johns-Manville Asbestos Limited at Asbestos, Quebec, Canada.[3] A box appearing immediately

---

[3] The Chemical Week article, Martin's letter, and Hendry's September 29, 1966, reply are discussed in Castleman, Asbestos: Medical and Legal Aspects (5th ed. 2005) p. 534.

above the article's title listed sources of airborne asbestos, including "Motor vehicle brake linings and clutch plates." The contents of the Martin letter are quoted in full in part III.A.1, *post*. The Martin letter plays a role in this appeal because Honeywell contends its admission into evidence was prejudicial error.

Honeywell's corporate representative testified that in 1973 Bendix began placing warning on the cartons for asbestos-containing brake pads. The warning label used the exact language prescribed by newly enacted OSHA regulations and was placed on the side of the box so it would be visible when the boxes were stacked. The warning stated: "Caution: Contains asbestos fibers, avoid creating dust. Breathing asbestos dust may cause serious bodily harm."

In December 1975, Jacob W. Tawiah presented Bendix with a review of the medical literature addressing the health hazards of asbestos. The executive summary of the review stated that medical knowledge at that time associated asbestos with three primary diseases: asbestosis, lung cancer and mesothelioma, a rare form of cancer that is the most deadly of the three. It also described the general agreement that the diseases are positively correlated to the intensity and duration of exposure to asbestos dust, but noted "there is no conclusive proof of a safe threshold level of exposure." The summary stated that there have been cases of mesothelioma that cannot be linked to asbestos, but exposure to asbestos dust is the only known cause of mesothelioma. The commentary section of the executive summary stated: "The medical literature is full of solid evidence linking asbestos to disease. Eliminating the emission of asbestos dust into the working environment appears to be an obvious way of dealing with the problem. This, however, may not be the most feasible approach in light of economic considerations. It then becomes necessary to examine what other alternatives exist." Many of the references listed at the end of the review predate the 1970's.

*Asbestos*

The term "asbestos" is applied to six different types of naturally occurring mineral fibers. (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 177, fn. 2 (*Webb*).) When mined and processed, asbestos generally is separated into thin fibers that are then mixed with a binding agent so the fibers may be used in various products. (*Ibid*.)[4] The individual fibers are invisible to the naked eye. (*Ibid*.) The six types of asbestos are divided into two groups, amphibole and serpentine. The only member of the serpentine group used in a commercial setting is chrysotile, which was the type used in Bendix brakes. The amphibole family contains the other five types, of which amosite and crocidolite are used commercially. The differences between the two groups was explained during the trial and Honeywell argued Phillips's mesothelioma was caused by his exposure to asbestos fibers from the amphibole group, not chrysotile fibers from Bendix brakes.

The different types of asbestos have different physical properties and different chemical makeups. As to shape, chrysotile tends to be curved (i.e., spiral) and thin compared to the straight, thin structure of amphibole asbestos. The physical and chemical differences affect both the human body's ability to clear the fiber and the fiber's toxicity—that is, the likelihood the fiber will cause disease.

In this case, the term "biopersistence" was used to refer to the capacity of asbestos fibers to persist over time in specific tissues of the body and retain their chemical and physical features. Underlying the use of this term is the testimony that the longer a fiber

---

**4** Asbestos was used by the ancient Greeks, Romans and Charlemagne. (See Comment, *The Threshold Level of Proof of Asbestos Causation: The "Frequency, Regularity and Proximity Test" and a Modified Summers v. Tice Theory of Burden-Shifting* (1995) 24 Cap. U. L.Rev. 735, 737 [Roman slaves wore transparent bladder skins as veils to avoid inhaling asbestos dust]; Comment, *Issues in Asbestos Litigation* (1983) 34 Hastings L.J. 871, 872, fn. 7.)

remains in the tissue and retains the characteristics of asbestos, the higher the risk that it will induce adverse health effects.

Carl Andrew Brodkin, M.D., testified as plaintiffs' medical expert. Dr. Brodkin stated amphiboles last longer in the human body, with a half-life measured in months or years, while the half-life of chrysotile is measured in weeks or months. Nonetheless, Dr. Brodkin stated his opinion that (1) all of the major types of commercial asbestos fibers are known to cause cancer, in both the lung and the lining of the lung; (2) amosite and crocidolite are about three times more potent than chrysotile in causing mesothelioma;[5] and (3) persons exposed to chrysotile have far higher rates of mesothelioma than individuals who are not exposed. In contrast, a Honeywell expert, Richard L. Attanoos, M.D., testified that chrysotile-containing friction products, such as brakes, do not cause mesothelioma. Another Honeywell expert, David Weill, M.D., testified that available medical literature and cohort studies showed that individuals working with chrysotile products did not have an elevated risk of mesothelioma. Dr. Weill distinguished the risk from lower exposures experienced by people who work with chrysotile products from the risk of higher exposures experienced by workers who mine chrysotile.

Dr. Attanoos explained his opinion that brakes do not cause mesothelioma by stating that (1) the asbestos in brakes is chrysotile, not amphibole, and chrysotile has a low biopersistence; (2) the chamfering done before brakes are installed releases fibers encapsulated in resin that do not have the normal respirability; (3) the brake dust created by the braking process contains only about one percent chrysotile because the friction of

---

[5] The experts who testified in *Webb*, *supra*, 63 Cal.4th 167, presented a range of opinions about the relative risk of contracting mesothelioma after exposure to crocidolite and chrysotile. "One expert opined that crocidolite presents five times the risk of chrysotile asbestos … and conceded crocidolite might present a risk as high as 10 times the toxicity of chrysotile. A second expert opined that crocidolite is 500 times as toxic, and testified that others estimated its risk to be 800 times has high." (*Id*. at p. 194, (conc. & dis. opn. of Cantil-Sakauye, C.J.).)

braking creates very high temperatures that breaks down the chrysotile into a noncarcinogenic material called forsterite; and (4) the chrysolite remaining in brake dust tends to be very small in size.

Dr. Brodkin agreed the heat of braking causes a breakdown of asbestos fiber into forsterite and "[t]here is no evidence that forsterite causes disease." He testified the studies of brake dust that found less than one percent residual asbestos were at the low end of the range and referred to other studies finding 5, 6 and 15 percent residual asbestos in brake dust.

*Mesothelioma*

Mesothelioma is a relatively rare cancer that occurs in the lining of the lung, which is called the pleura. (*Webb*, *supra*, 63 Cal.4th at pp. 194-195 (conc. & dis. opn. of Cantil-Sakauye, C.J.).) As the cancer grows, it "will eventually entrap the entire lung, creating the tightening effect of a corset by preventing the lung from expanding. The cancer also grows outward into the chest wall where it irritates nerve roots, creating pain. People with mesothelioma live, on average, 12 to 14 months." (*Id.* at p. 195.)

Our Supreme Court recently described mesothelioma as a cancer "closely associated with asbestos exposure." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1141; see *Moran v. Foster Wheel Energy Corp.* (2016) 246 Cal.App.4th 500, 503 [mesothelioma is "a cancer uniquely associated with exposure to asbestos"]; Hoffheimer, *California's Territorial Turn in Choice of Law* (2015) 67 Rutgers U. L.Rev. 167, 191, fn. 125 [research report of National Cancer Institute cited for propositions that by "1988, asbestos was identified as the only known risk factor for mesothelioma" and the time lag between exposure and developing mesothelioma usually is 30 to 40 years].)

Dr. Brodkin testified that mesothelioma is a dose-response disease, which means the greater the dose of asbestos, the greater the risk for the disease. Dr. Brodkin's testimony about the causal connection between the asbestos exposures identified in this case and Phillips's mesothelioma is set forth in part III.B.4, *post*.

8.

Mesothelioma (in contrast to asbestosis) is not a cumulative disease in the sense that each inhalation of asbestos generates a certain amount of disability. (Stapleton, *The Two Explosive Proof-of-Causation Doctrines Central to Asbestos Claims* (2009) 74 Brook. L.Rev. 1011, 1023.) The more a person is exposed to asbestos, the more likely asbestos-related cancer will occur, but once the cancer occurs its severity does not depend upon the amount of asbestos to which the victim was exposed. (*Id*. at pp. 1023-1024.) Also, mesothelioma is "indivisible in the sense that it is beyond our current abilities to ascertain which asbestos fiber(s) caused the illness." (Sanders, *The "Every Exposure" Cases and the Beginning of the Asbestos Endgame* (2014) 88 Tul. L.Rev. 1153, 1161.) This characteristic underlies our Supreme Court's conclusion in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 (*Rutherford*) that "[i]n an asbestos-related cancer case, the plaintiff need *not* prove [asbestos] fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth." (*Id.* at p. 982.) Instead, our Supreme Court adopted a special rule allowing plaintiffs to prove exposure to the defendant's product was a substantial factor in causing the cancer by showing (in a reasonable medical probability) the exposure was a *substantial factor contributing to the decedent's risk of developing cancer*. (*Ibid*.)

*Phillips's Exposure to Asbestos*

Phillips was born in September 1953. In 1967, Phillips had a summer job where he learned how to change brakes. In 1969, 1970 and 1971, while in high school, Phillips worked as an attendant and mechanic at gas stations in Mariposa. While employed at the gas stations, he performed many tasks, including brake jobs. In addition to the brake jobs at the gas stations, Phillips performed brake jobs on his own vehicles and the vehicles of

9.

friends.**6**  Phillips did brake jobs throughout the 1970's and 1980's, right up to the time he was diagnosed with mesothelioma.

When asked if he could quantify the number of vehicles on which he did brake work, Phillips answered, "No.  A lot."  Asked again during his deposition, Phillips stated, "I couldn't count them.  Quite a few."  Phillips identified the brands of brakes he installed or removed as Raybestos, Rayloc, Wizard, Bendix and Vapex.  He was aware of the brand because it was printed on the box and stamped on a metal part of the brake. Phillips described the steps he took when installing Bendix brakes as follows:

> "Take it out of the package, clean them up.  You want to scuff the shiny stuff off with sandpaper, you know, if you have some rough 80 [grain sandpaper], and chamfer the edges.  Remove the old brakes, install the new brakes with the springs and stuff – the new brake drums with the springs and stuff – the new brake pads with the springs.  Clean all the dirt out, blow all the dust off, and then install the new brakes, and put the drum back on, and then you readjust the brakes up until the drum stops moving and back it off 13 clicks, and put your tires on it."

Phillips also stated that the cleaning process involved the use of compressed air to blow the dust out of the brake drum, which was messy but worked well.

In 1972, at the age of 19, Phillips was employed as a maintenance worker by Mariposa County High School.  Phillips held that job for one year.  He sometimes worked at a bench in a room that housed a boiler and insulated steam pipes.  Phillips also worked directly with insulation.  When a valve on the steam heating system malfunctioned, Phillips or his boss would fix the valve and then Phillips would remove any affected insulation, do the necessary clean up, and replace the pipe's insulation.  He also remembered removing insulation from a storage tank and rewrapping the tank with new insulation.  Phillips testified that he assumed the insulation contained asbestos.

---

**6**  Phillips owned roughly 40 vehicles over his lifetime.  Honeywell summarized his deposition testimony by stating Phillips was able to recall changing brakes on 21 vehicles, which he identified by make and model.

Plaintiffs' expert, Dr. Brodkin, testified the insulation was likely to contain asbestos and estimated its content at 12 to 50 percent. Dr. Attanoos testified thermal insulation from that period would have contained amphibole asbestos. The jury allocated 15 percent of the fault to boiler insulation, impliedly finding the insulation contained asbestos.

During Phillips's employment at the high school, he also worked on a project that involved the installation of asbestos cement pipe, which he called transite pipe.[7] Phillips estimated that he installed approximately 120 linear feet of the pipe and cut the pipe about 40 times using a snap cutter, Skilsaw with carborundum blade, or a handsaw. Phillips stated he did about half the cuts with the Skilsaw, which he described as messy.

In 1973, Phillips began working as a plumber. He worked about seven years for Hudson's Plumbing, followed by a year at Posey Plumbing. In the late 1980's, he returned to Hudson's Plumbing for another four years. Phillips testified that he worked with asbestos cement pipe while at Hudson's Plumbing.

Phillips worked a brief stint with the Mariposa Public Utilities District and then was employed by a construction company. One of the construction company's projects involved the removal of water and sewer lines at Yosemite National Park, some of which were asbestos cement pipe. The jury allocated 23 percent of fault to asbestos-containing cement pipe.

Additional exposures to asbestos occurred when Phillips did repair and maintenance work on vehicles he owned or friends owned, such as (1) the installation of clutches and (2) the removal and installation of gaskets, particularly on carburetors. Phillips testified he learned how to perform a clutch job when he was 14 or 15 years old and did his last clutch job about two years before his 2012 deposition. He stated he could

---

[7] In *Webb*, the court stated that Johns-Manville "made an asbestos cement pipe known as Transite pipe. Although 'Transite' was trademarked by Johns-Manville, the name became a generic term for all brands of asbestos cement pipe." (*Webb*, *supra*, 63 Cal.4th at p. 178.)

not count the number of clutch jobs he did, but described some of the vehicles he worked on, including a 1966 Chevelle Super Sport that he and his wife used to drag race and required 13 new clutches.  The jury allocated 9 percent of the fault to clutches and 5 percent to automotive gaskets.

In March 2012, Phillips was diagnosed with mesothelioma.  He died in February 2013.

## PROCEEDINGS

In May 2012, Phillips and his wife, Charity Phillips, filed a complaint seeking damages for personal injuries caused by asbestos.  In May 2013, after Phillips's death, Charity Phillips, individually and as the personal representative of his estate, filed a first amended complaint alleging negligence and strict liability.  Three of their children were added as plaintiffs and asserted claims for wrongful death.[8]  For purposes of this opinion, "plaintiffs" refer to Phillips's wife and the three children.

The first amended complaint named over 25 defendants engaged in the manufacture or supply of products containing asbestos.  Defendant Honeywell, formerly known as AlliedSignal Inc., was sued individually and as the successor-in-interest to The Bendix Corporation, a manufacturer of automotive brakes.  Bendix brakes were among the asbestos-containing products to which Phillips was exposed.

Plaintiffs settled with most of the defendants and the matter proceeded to trial against Honeywell and Calaveras Asbestos Ltd.  Calaveras Asbestos Ltd. was granted nonsuit during the jury trial.  As a result, Honeywell was the only defendant remaining in the case when it was presented to the jury.

---

[8]  Phillips and Charity were married in 1972.  Their youngest child was 30 years old at the time of Phillips's deposition in September 2012.

*Jury's Findings as to Liability*

In May 2014, the jury completed a special verdict form that addressed plaintiffs' negligence claim and three separate theories of strict liability. As to negligence, the jury expressly found (1) Phillips had been exposed to asbestos from Bendix brakes; (2) Bendix was negligent in manufacturing or selling asbestos-containing brakes; and (3) Bendix's negligence was a substantial factor in causing harm to Phillips.

Plaintiffs' other successful legal theory was strict liability based on the failure to warn. The jury found (1) Bendix's asbestos-containing products had potential risks that were known or knowable in light of the generally accepted scientific and medical knowledge that was available at the time of sale; (2) the potential risks of Bendix's asbestos-containing products presented a substantial danger to persons using or misusing the product in an intended or reasonably foreseeable way; (3) ordinary consumers of the products would have failed to recognize the potential risks; (4) Bendix did not adequately warn or instruct consumers of the potential risks; and (5) the lack of sufficient warnings or instructions on Bendix's asbestos-containing products was a substantial factor in causing harm to Phillips.

Plaintiffs were unsuccessful on their strict liability theories based on (1) a risk-benefit analysis of the product's design and (2) consumer expectations. The jury answered "no" when asked if the risks of Bendix's design outweighed the benefits of the design. As to consumer expectations, the jury found that Bendix's products failed to perform as safely as an ordinary consumer would have expected when used or misused in an intended or reasonably foreseeable way. However, the jury also found that the design of the products was not a substantial factor in causing harm to Phillips.

The jury was asked to allocate the fault that caused harm to Phillips among eight sources. Those sources and the jury's percentage allocation were Bendix (30 percent), asbestos-containing cement pipe (23 percent), brakes from other manufacturers (15

13.

percent), boiler insulation (15 percent), clutches (9 percent), automotive gaskets (5 percent), joint compound (3 percent), and mastic (0 percent).[9]

*Actual Damages*

The parties stipulated to economic damages of $900,000. The amount of noneconomic damages was decided by the jury. It found Charity Phillips's noneconomic losses were $5,550,000 and the three children experienced noneconomic losses of $329,500 each. Thus, plaintiffs' noneconomic damages totaled $6,538,500.

*Punitive Damages*

The jury's special verdict included a finding that, based on clear and convincing evidence, one or more of Bendix's officers, directors or managing agents acted with malice or oppression in the conduct upon which the finding of liability was based. Based on this finding, the trial proceeded to a punitive damages phase. The jury awarded $3.5 million in punitive damages.

*Judgment and Appeal*

The damages were adjusted by the trial court to reflect (1) the jury's allocation of fault to other causes and (2) the settlements paid to plaintiffs by other defendants. The settlements totaled $4,041,750. The court determined Honeywell was liable for $1,961,550 in noneconomic damages (i.e., 30 percent of $6,538,500), $414,990 in economic damages, and $3.5 million in punitive damages.

---

[9] "Mastic" refers to a paste-like material spread before the installation of tiles or other flooring. Exposure to asbestos can occur while installing new flooring or while removing old flooring and the mastic holding it in place. When in his early teens, Phillips removed the vinyl flooring in a laundry room so new flooring could be installed. The job involved scraping the old mastic off the floor, which Phillips accomplished using a wire brush and spatula. The jury's finding as to mastic implies it did not accept or apply the every-exposure theory challenged by Honeywell. (See pt. III, B, *post*.)

On September 17, 2014, the trial court entered a judgment holding Honeywell liable for $5,876,540. In October 2014, Honeywell filed a notice of appeal challenging the judgment.

## DISCUSSION

I.    CONSISTENCY OF THE SPECIAL VERDICT*

Honeywell's claims of legal error are discussed in reverse chronological order. First, we consider whether the answers in the special verdict are consistent. Second, we address whether the trial court erred in rejecting Honeywell's proposed jury instruction about the factors relevant to causation. Third, we consider Honeywell's claims that evidence was improperly admitted. After resolving the claims of legal error, we turn to Honeywell's challenges to the sufficiency of the evidence for the jury's findings relating to (1) the failure to warn and (2) punitive damages.

A.    Basic Principles of Law

1.    *Appellate Review*

Whether two of the jury's findings in a special verdict are inconsistent with each other is analyzed as a matter of law. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678.) Consequently, when analyzing a claim of inconsistency, appellate courts conduct an independent review that does not defer to the trial court's determination. (See *Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1500 [special verdict's correctness subject to de novo review].) When an appellate court identifies inconsistent findings in a special verdict, it may not choose which of the inconsistent findings to implement. (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358 (*Singh*).) Instead, a new trial must be ordered. (*Ibid.*)

_____

*    See footnote, *ante,* page 1.

### 2. *Identifying an Inconsistency*

The test for inconsistency requires that there be no possibility of reconciling the answers in the special verdicts with each other. (*Singh*, *supra*, 186 Cal.App.4th at p. 357.) Under this test, courts evaluate whether there is *any* possibility of reconciliation under *any possible application of the evidence and the jury instructions*. (*Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1183.) If it is reasonable to draw conclusions that would explain the purported contradiction, the reviewing court deems the jury to have drawn those conclusions and the answers in the special verdict are upheld. (*Ibid*.)

### B. Instructions Given and Findings Made in This Case

### 1. *Instruction Relating to Causation*

The jury's answers to questions contained in a special verdict must be evaluated in context. That context includes the evidence presented, the arguments made, and the instructions given. In this case, the following instructions about causation were given:

> "A person's negligence may combine with another factor to cause harm. If you find that defendant Honeywell (Bendix)'s negligence was a substantial factor in causing [harm to plaintiffs], then defendant is responsible for plaintiffs' harm.

> "Defendant cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing plaintiffs' harm.

> "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It does not have to be the only cause of the harm.

> "Plaintiffs … may prove that exposure to asbestos from defendant Honeywell (Bendix)'s product was a substantial factor causing James Lester Phillips' illness by showing through expert testimony that there is a reasonable medical probability that the exposure was a substantial factor contributing to his risk of developing cancer."

16.

The final paragraph of these instructions was based on CACI No. 435 (Causation for Asbestos-Related Cancer Claims), which sets forth the special rule for proving causation adopted by our Supreme Court in *Rutherford*, *supra*, 16 Cal.4th 953.

During its deliberations, the jury sent the trial court a written request for a definition of the word "substantial." The jury's request referred to a question in the special verdict relating to causation that used the term "substantial factor."

The trial court's response was influenced by the statements in *Rutherford* that undue emphasis should not be placed on the term "substantial" and that it was neither possible nor desirable to reduce "substantial factor" to any lower terms. (*Rutherford*, *supra*, 16 Cal.4th at p. 969.) The trial court told counsel they could either agree to a definition and thereby "waive appeal on that one issue" or the court would tell the jury that the term "substantial" could not be defined further than already found in the instructions. Counsel could not agree on a definition and the court informed the jury that a further definition could not be provided. Neither side contends the trial court committed error by deciding not to provide a further definition to the jury.[10]

### 2. Questions and Answers About Causation

The first three questions in the special verdict form addressed plaintiffs' negligence cause of action. The jury answered the first two questions by finding that Phillips had been exposed to asbestos from Bendix brakes and Bendix had been negligent in designing and manufacturing, or in selling, its brakes. Question 3 of the special verdict asked: "Was Bendix's negligence a substantial factor in causing harm to James Phillips?" The jury answered "yes" in a nine-to-three vote.

---

[10] The trial court rejected plaintiffs' proposed instruction that incorporated part of CACI No. 430 and the following statement by the Supreme Court: "This court has suggested that a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor." (*Rutherford*, *supra*, 15 Cal.4th at p. 969.) The second sentence of CACI No. 430 states a substantial factor "must be more than a remote or trivial factor."

17.

The special verdict form presented three theories of strict liability to the jury—consumer expectation, risk-benefit and failure to warn. As to strict liability based on a failure to warn, the 11th and 12th questions in the special verdict form asked if Bendix failed to adequately warn or instruct of the potential risks of its asbestos-containing products and, if so, whether the failure was a substantial factor in causing harm to Phillips. The jury answered both questions "yes."

As to strict liability under the consumer expectations theory, the fourth question in the special verdict asked: "Did Bendix's asbestos-containing products fail to perform as safely as an ordinary consumer would have expected when used or misused in an intended or reasonably foreseeable way?' The jury answered "Yes." The fifth question asked: "Was the design of Bendix's asbestos-containing products a substantial factor in causing harm to James Phillips?" The jury answered "No."

Honeywell contends this "No" answer relating to causation is diametrically opposed to the jury's findings that Bendix's negligence and its failure to warn were substantial factors in causing Phillips's harm. Honeywell argues: "Having found the design did *not* cause his harm, the jury could not logically conclude that a failure to warn of a potential hazard *did* harm Phillips." We disagree. The findings are easily reconciled.

### 3.    *Possible Reconciliation of Findings*

First, the above-quoted argument by Honeywell slightly mischaracterizes the jury's findings and then uses that slight mischaracterization to support its claim of inconsistency. The jury's answer "no" to whether "the design of Bendix's asbestos-containing products [was] a substantial factor in causing harm to James Phillips" is not exactly the same as finding absolutely no causal connection between the design and Phillips's mesothelioma. The "no" answer leaves open the possibility that the design was a factor in causing the harm—specifically, that it was an *insubstantial* factor. Under the

18.

rules for determining inconsistency, we must determine whether this possible interpretation of the jury's finding can be reconciled with the jury's other findings that negligence and the failure to warn were substantial factors in causing the harm to Phillips.

We conclude it is possible for a jury to find that the design of the Bendix brakes was an *insubstantial* factor in causing Phillips's mesothelioma and that negligence and the failure to warn were *substantial* factors in causing the illness. The jury reasonably could have concluded that the factor to be given the greatest weight was the one that operated closest in time to the exposure and, similarly, the least substantial factor was the one furthest removed in time. Weighing the evidence in this manner (1) is not contrary to law, (2) would not have violated any of the instructions given to the jury, and (3) is consistent with the leeway given to the jury.[11] In short, the jury reasonably could have determined the lack of a warning was the dominant factor in causing the harm.

Therefore, under the rules that define when answers in a special verdict are inconsistent (see pt. I.A.2, *ante*), we conclude the jury's answers to questions about causation and substantial factors can be reconciled and Honeywell is not entitled to a new trial on the ground of inconsistencies in the special verdict.

II.    INSTRUCTIONAL ERROR RELATING TO CAUSATION[*]

A.    Basic Principle of Law

1.    *Independent Standard of Review*

Whether the trial court's jury instructions were erroneous is a legal question to which appellate courts apply a de novo standard of review. (*Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 617.) Many types of instructional error are recognized by

---

[11]    That leeway is demonstrated in part by the trial court's decision not to provide a further definition of the term "substantial."

[*]    See footnote, *ante,* page 1.

California courts.  (*Id*. at p. 619.)  In this appeal, the error asserted is the refusal to give a proposed instruction.

### 2. *Rejection of Proposed Instruction*

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court … must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) Rejection of a proposed instruction that correctly states the law is not necessarily error. A court may refuse to give an otherwise correct instruction if it duplicates matters covered in other jury instructions.  (*City of Los Angeles v. Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473, 490.)

Of relevance in this appeal is the principle that when a portion of a proposed instruction is legally correct and another portion is incorrect, the trial court commits no error by rejecting the instruction.  (*Heggblade-Marguleas-Tenneco, Inc. v. Sunshine Biscuit, Inc.* (1976) 59 Cal.App.3d 948, 957 [instruction must be entirely correct before appellant may complain about trial court's refusal to give it].)  Generally, the trial court in a civil case has no sua sponte duty to revise, edit or cull the incorrect statements of law from a proposed instruction and present a corrected version of the instruction to the jury. (*Menchaca v. Helms Bakeries, Inc.* (1968) 68 Cal.2d 535, 543; see 3 Wegner, et al., *Cal. Practice Guide: Civil Trial and Evidence* (The Rutter Group 2016) ¶ 14:26 p. 14-8 [no duty to modify incorrect instructions].)  In addition, a court may refuse a proposed instruction that is misleading.  (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 684-685.)

B.      Jury Instructions

*1.      Instructions Given by Trial Court*

The four paragraphs of instructions given the jury on the topic of causation are set forth in part I.B.1, *ante*, and need not be repeated here.  The first two paragraphs were based on CACI No. 431 (Causation: Multiple Causes).  The last two paragraphs were based on CACI No. 435 (Causation for Asbestos-Related Cancer Claims).

CACI No. 435's discussion of exposure to asbestos is derived from statements made by the California Supreme Court in *Rutherford*, *supra*, 16 Cal.4th 953, which includes the following:

> "In an asbestos-related cancer case, the plaintiff need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth.  Instead, the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer.  The jury should be so instructed.  The standard instructions on substantial factor and concurrent causation (BAJI Nos. 3.76 & 3.77) remain correct in this context and should also be given."  (*Rutherford*, *supra*, at pp. 982-983, fn. omitted.)

The jury instructions given in this case are consistent with the directions provided by our Supreme Court in *Rutherford*.

*2.      Honeywell's Proposed Instruction*

Honeywell proposed the following as special instruction No. 1:

> "The parties dispute whether James Phillips's claimed exposure to asbestos-containing Bendix brakes was a substantial factor in causing his mesothelioma.  [¶]  Many factors are relevant in assessing the medical probability that any alleged asbestos exposure was *a substantial factor in causing an injury*.  These factors include the type of asbestos, the nature of the exposure, the frequency of the exposure, the regularity of exposure, the duration of exposure, the proximity of the asbestos-containing product, and the type of asbestos-containing product."  (Italics added.)

21.

C.    Proposed Instruction:  Inaccurate or Misleading

The proposed instruction refers to the medical probability that an asbestos exposure was a substantial factor *in causing an injury*.  This choice of words does not accurately track the special rule for proving causation adopted in *Rutherford* to address the currently unsolvable problem of identifying the manufacturer of the specific fibers of asbestos that caused the cancer.  (*Rutherford*, *supra*, 16 Cal.4th at p. 976.)  Our Supreme Court described the problem and its solution as follows:

> "Plaintiffs cannot be expected to prove the scientifically unknown details of carcinogenesis, or trace the unknowable path of a given asbestos fiber.  But the impossibility of such proof does not dictate use of a burden shift.  Instead, we can bridge this gap in the humanly knowable by holding that plaintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability *was a substantial factor in contributing* to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth."  (*Rutherford*, *supra*, 16 Cal.4th at pp. 976-977, first italics added.)

This solution is reflected in the language of CACI No. 435 that refers to showing "a reasonable medical probability that the exposure was a substantial factor contributing to [his/her] risk of developing cancer."  In comparison, Honeywell's proposed instruction stated in part:  "Many factors are relevant in assessing *the* medical probability that any alleged asbestos exposure was *a substantial factor in causing an injury*."  (Italics added.)  If this instruction had accurately reflected the approach adopted in *Rutherford*, the italicized language in the foregoing quote would have been replaced by the following underlined wording so that it read:

> Many factors are relevant in assessing <u>a reasonable</u> medical probability that any alleged asbestos exposure was a substantial factor <u>contributing to his risk of developing cancer</u>.

As clarified in *Rutherford*, proving that exposures contributed to *the risk of developing cancer* and is different from proving such exposures were a substantial factor in causing the cancer. Honeywell's proposed instruction erred by eliminating the concept of contributing to the risk of developing cancer and replacing it with causing cancer. As a result, the proposed instruction did not fit accurately with our Supreme Court's special rule for proving causation in asbestos-related cancer cases. (See *Rutherford*, *supra*, 16 Cal.4th at pp. 976-977.) Stated another way, the proposed instruction was not tailored to the special rule and, as a result, was inaccurate and misleading. Therefore, we conclude the trial court properly rejected Honeywell's proposed instruction. (See *Soule*, *supra*, 8 Cal.4th at p. 572 [party entitled to have proposed instruction given only if it is correct].)

## III.    EVIDENTIARY ERROR

### A.    Martin Letter

#### 1.    Contents of Letter

Plaintiffs offered as an exhibit the Martin letter, which was dated September 12, 1966, and addressed to Noel Hendry at Canadian Johns-Manville Asbestos Limited, the company that supplied asbestos to Bendix.[12] The body of the Martin letter stated:

> "Just to be sure you have a copy, an article that appeared in Chemical Week magazine is [e]nclosed. [¶] So that you'll know that Asbestos is not the only contaminate, [*sic*] a second article from O.P. & D Reporter assess[es] a share of the blame on trees.

> "My answer to the problem is: if you have enjoyed a good life while working with asbestos products why not die from it. There's got to be some cause."

The parties characterize the sarcasm in the final paragraph differently. Plaintiffs argued its shows a Bendix employee was aware that exposure to asbestos could cause

---

[12]    The Johns-Manville asbestos mine in Quebec has been described by our Supreme Court as one of the world's largest sources of chrysotile asbestos. (*Webb*, *supra*, 63 Cal.4th at p. 178.)

23.

death.  Honeywell interpreted the letter as "nothing more than a sarcastic expression of confidence in a product ingredient by a corporate employee who was not an officer, director or managing agent of Bendix."

### 2. *Proceedings Involving the Letter*

Before trial, Honeywell filed a motion in limine requesting the Martin letter be excluded on the grounds it was inadmissible hearsay, unauthenticated, irrelevant and highly prejudicial.  On the first day of the trial proceedings, the trial court heard argument on the motion and, the next day, informed counsel of its ruling.  The court stated it would admit the Martin letter "in its present form, with a limiting instruction that the only use of the document is whether or not that document put … Bendix … on notice of the danger of asbestos."  The court allowed the document to be presented as evidence contradicting Honeywell's position that Bendix did not become aware of the dangers associated with asbestos until later in the 1960's or in the 1970's.

Pursuant to its ruling, the trial court gave a limiting instruction about the purposes for which various documents, including the Martin letter, could be used by the jury.  The limiting instruction was given prior to the closing arguments of counsel and stated:

> "Ladies and gentlemen, you have heard about and seen certain documents from the Friction Materials Standards Institute (FMSI), Bendix, Johns-Manville, the Asbestos Information Association, news media, and other sources.  You may consider those documents and the statements contained in those documents only in deciding the issue of whether Bendix had notice of matters discussed in the statements and for impeachment. [¶] Those specific documents will be Exhibits 783, 376, 792, 793, 874, 799, 808, 149, 810, 822, 2722, and 2723 and be contained in a separate binder. [¶] You may not use the documents and statements as independent proof that the statements in those documents are true."[13]

In his opening statement, counsel for plaintiffs referred to the Martin letter, stating "it's going to be hard to dispute that Bendix knew before Mr. Phillips ever touched a

---

[13]     The Martin letter was designated trial exhibit No. 783.

brake that asbestos can cause disease and can kill you.  We're going to prove that.  [¶] Bendix admits people will die from asbestos.  September 12th, 1966.  We will show that to you, that they had knowledge.  They knew that asbestos fibers could kill."  Counsel continued by listing other dates to the jury, stating:  "October 16th, 1966, Bendix knows that asbestos is linked to cancer.  [¶] January 7th, 1969, Johns-Manville tells Bendix asbestos causes mesothelioma.  Johns-Manville was a supplier of asbestos fibers to Bendix."

The jury heard the last paragraph of the Martin letter during the presentation of a video deposition of Honeywell's corporate representative, Joel Cohen.  During that deposition, plaintiffs' counsel asked about when Bendix first had an indication that asbestos could cause disease.  Cohen stated, "I can tell you that in 1968 [Bendix] did receive this letter [from Johns-Manville], and I believe that's what put [Bendix] on notice."

During closing argument, plaintiffs' counsel referred to Cohen's testimony and challenged the accuracy of Cohen's date of notice by stating:  "You saw this letter; right? [¶] September 12th, 1966.  This is E.A. Martin's letter, the director of purchasing at the New York plant."  Counsel then read the final paragraph of the letter and stated:  "They knew.  They knew.  1966.  What is it, '68 or '66?  The facts changed.  They got to be forthright with you.  That's what a reasonable company does.  [¶]  So were they negligent?  Yes.  The answer to question 2 [on the special verdict form], we feel we've shown enough to show that they were negligent; okay?"

Later in his closing argument, plaintiffs' counsel again quoted the final paragraph of the Martin letter to support his argument that Bendix "knew in 1966 that asbestos could kill.  They knew that."  Counsel asked, "what's the significance of 1966?  It's one year before James Phillips ever touches a brake.  They knew."

Honeywell's counsel also addressed the Martin letter in his closing argument.  He quoted the trial court's limiting instruction and then stated:

25.

"Now let me talk about the E.A. Martin letter. [¶] This is a letter that you heard read, and essentially it's from a purchasing agent. Yes, he calls himself director of purchasing. He's not a director of the corporation. He's not a corporate director. He's not a CEO. He's not a CFO.

"This is --- essentially, this letter is like that one bad e-mail that all of us has written at one time. Is it fair to judge an entire company based on one letter from someone who orders supplies? That's what the question is for you.

"What he did is he bought raw asbestos from a supplier. He makes no references to brakes. What he's saying, if you read the letter, is he's saying, 'I know. Everyone's talking about asbestos lately. We're not concerned.' He makes a joke. He says, you know, maybe the problem is trees or something; who knows. And he's making a sarcastic comment. The sarcastic comment is, huh, you know, you made a good living from asbestos; you might as well die from it.

"He's talking about himself. He made a good – in part he's talking about himself. He made a good living from asbestos. He's – the joke is, the sarcastic remark – it's like saying boy, is it cold out here on a day like today when it's nice and hot. He's saying the opposite. He's saying we're not worried about it like, yes, as if we're worried about it.

"And that, again, is not evidence of any notice of a problem with brakes. It's a discussion of raw asbestos used in the plant, no discussion about brakes."

In his rebuttal, plaintiffs' counsel responded to Honeywell's argument that Martin's letter was a sarcastic comment or a joke sent to a buddy, by stating "that's a terrible joke to make if you're buying asbestos and selling it. That's a terrible joke to make."

Also, during the punitive damages phase of the trial, plaintiffs' counsel repeated his argument about the Martin letter showing Bendix knew asbestos was hazardous in 1966. Honeywell's counsel responded as follows:

"So let's talk about the E.A. Martin letter. E.A. Martin, larger than life, a letter written or reportedly written in September of 1966, to a colleague at Johns-Manville, the same company that three years later said that their research indicated there was no problem from a health perspective with asbestos in brakes, is writing in response to an article that appeared in a

26.

magazine. And he does make the statement, if he wrote the letter, 'If you have enjoyed a good life while working with asbestos products, why not die from it.'

"Mr. Martin was a director of purchases. He wasn't a member of the board of directors of the Bendix Corporation. He wasn't an officer of the corporation. He wasn't a manager of the corporation. You've seen no evidence that anyone at the Bendix Corporation saw this letter, acted in response to this letter, did anything to approve or ratify the comments that were made, these personal comments, if they were made, of Mr. Martin. And you see that this letter is not signed, and that there's handwriting on the letter. But if he wrote the letter, there's nothing to indicate that anyone at Bendix did anything in a malicious or oppressive way or reprehensible way, with knowledge of that letter.

"Mr. Martin, you really have heard no evidence about Mr. Martin, other than he was a director of purchases for a facility. He bought asbestos from a supplier. He was not responsible for health and safety of the Bendix Corporation. You certainly heard no evidence about that. But this letter is used as the re[e]d on which to build the case for the punitive damage award that's being sought in this case. [¶] That letter doesn't rise to that level."

Plaintiffs' counsel's final summation to the jury responded to Honeywell's argument about the Martin letter and emphasized what evidence had been presented and what evidence was not presented. Counsel stated, "You have tangible pieces of evidence of what Bendix knew and what they did. And what you don't have is an explanation as to why. And they chose in this case not to bring anybody to explain that." Counsel illustrated this point by stating that no evidence was presented as to what Bendix's health and safety director did from 1966 through 1975.

### 3. Authentication

Honeywell's appellate briefing does not raise the lack of authentication as a separate issue on appeal and does not cite Evidence Code section 1400, which governs the authentication of writings.[14] We note, however, Honeywell's briefs state that it

---

[14] "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b)

27.

challenged the admission of the Martin letter in the trial court on the ground the letter was not authenticated. For purposes of clarity, we state why authentication is not an issue addressed in this opinion. Specifically, the statements in Honeywell's brief were insufficient to raise the issue of authentication for purposes of this appeal.

By rule, an appellant's brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).) When a potential issue or argument is not presented to an appellate court in a separate heading or subheading, that issue or argument is deemed forfeited. (*Foster v. Britton* (2015) 242 Cal.App.4th 920, 928, fn. 6; see *People v. Roscoe* (2008) 169 Cal.App.4th 829, 840 [purpose of rule].)

Here, the admission of the Martin letter into evidence is challenged by Honeywell on the grounds stated in the following heading: "The trial court erroneously admitted the Martin letter, which was not relevant and unduly prejudiced the jury against Honeywell."[15] (Boldface omitted.) Based on the contents of the briefs, the rule of court, and the case law applying that rule, we conclude Honeywell has not challenged the authentication of the Martin letter in this appeal.

### 4. Relevancy: Governing Principles

Evidence Code section 350 provides that "[n]o evidence is admissible except relevant evidence." "Relevant evidence" is defined as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

---

the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.)

[15] The exact same heading appears in Honeywell's opening brief and its reply brief.

Relevant evidence includes *circumstantial* evidence that tends to establish a fact from which the existence or nonexistence of the fact in issue can be inferred. (*Firlotte v. Jessee* (1946) 76 Cal.App.2d 207, 210.) The modifier "circumstantial" is used to emphasize the need to draw inferences from the evidence. (1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 1.) "An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b).)

### 5. *Analysis of Relevancy*

Honeywell contends the Martin letter "was clearly irrelevant. It did not establish that Bendix had notice of any material fact." Honeywell also complains that the Martin letter was introduced into evidence without the enclosed article, stating: "The enclosed article referred only to medical conditions not at issue here (asbestosis and lung cancer) and said nothing about any risks known, or even suspected, from the small amounts of chrysotile asbestos in brake dust."

Ordinarily, arguments about whether circumstantial evidence is relevant to the litigation are structured by (1) identifying a disputed material fact and (2) analyzing whether the evidence in question reasonably supports an inference about the existence or nonexistence of that disputed fact. Here, Honeywell's arguments do not accurately complete the first step and, lacking this grounding, fail to demonstrate that the Martin letter had no relevancy to any of the disputed material facts.

The first step—identifying disputed material facts—begins with an examination of the allegations made in the first amended complaint. Paragraph 7 of plaintiffs' first amended complaint alleged the defendants negligently and carelessly researched the health hazards of their products. Paragraph 8 of the first amended complaint alleged the defendants breached a duty to exercise reasonable care by failing to investigate the hazards of their product and by failing to warn of the health hazards of using their

29.

products. These allegations about the failure to research or investigate health hazards raises a question about when Bendix became aware of facts that would cause a reasonable person to conduct a further inquiry into the safety of its products. Therefore, we conclude that when Bendix became aware (i.e., had notice) of facts that would cause of reasonable person to conduct a further inquiry is a disputed material fact in this litigation.

The dispute continued beyond the pleading stage and became more specific by the time it was presented to the jury. Plaintiffs contended that in 1966 Bendix was on notice of potential health hazards that should have triggered further research and investigation. This timing was disputed by Cohen, Honeywell's representative, when he testified that a 1968 letter from Johns-Manville first put Bendix on notice that asbestos could cause disease. Therefore, the dispute about the material fact of notice extended to whether Bendix was aware of potential health hazards in 1966.

The second step of our inquiry considers whether the Martin letter reasonably supports an inference that Bendix's management was aware of the potential health hazards of airborne asbestos before 1968. We conclude the Martin letter reasonably supports an inference about Bendix's awareness and, therefore, the letter is relevant circumstantial evidence. (*Honeywell International, Inc. v. Guilder* (Fla.App. 2009) 23 So.3d 867, 870 (*Guilder*) [Martin letter "was relevant to proving Honeywell's knowledge of the dangers of asbestos in its products"].) As to foundational matters, the jury reasonably could have found that Martin drafted the letter and was aware of the magazine article about asbestos. Next, the jury reasonably could infer that (1) questions about the safety of asbestos were known generally within the asbestos industry and (2) Bendix's management was not more ignorant than Martin about these questions, which had serious business implications for a company selling asbestos products. Thus, the trial court did not abuse its discretion in determining the Martin letter was relevant circumstantial evidence.

30.

Honeywell's attempt to bolster its argument of irrelevancy by stating the attached article said nothing specifically about small amounts of chrysotile or about brake dust is unconvincing. The article was not presented to the jury, but is part of the appellate record. The article (1) addressed the dangers of airborne asbestos, (2) referred to the impact of airborne asbestos on "all Americans, … even though most of them never worked directly with asbestos," (3) mentioned chrysotile was the form of asbestos that held the predominant market position, and (4) included a list of the sources of airborne asbestos that referred to motor vehicle braking linings and clutch plates. The article's actual references to chrysotile asbestos and brake linings in connection with the hazards presented by airborne asbestos encompassed contradicts Honeywell's argument that the article was irrelevant to its product and, therefore, the Martin letter was irrelevant to the potential health hazards associated with its brakes. In short, Honeywell's argument that it needed information very specific to brakes and chrysotile before it could become aware of potential health hazards of its product is as unconvincing to us as it was to the jury.

As to the relevance of the sarcastic last paragraph, its reference to dying from asbestos tends to prove that the author was aware that the article was asserting a causal connection between the exposure to airborne asbestos and health impacts that could result in death. The possibility that the author believed the assertions were false or wildly exaggerated does not undercut his awareness that assertions were being made about potential health hazards. The knowledge or awareness that assertions about health impacts serious enough to cause death was relevant plaintiffs' allegation that Bendix breached the duty of reasonable care by failing to investigate the hazards of its products. For example, plaintiffs' counsel argued to the jury: "A reasonable company should research the *potential* health hazards of their products. That's reasonable." (Italics added.) Counsel supported this argument by referring to deposition testimony of Eugene

31.

Rogers[16] stating he did not know if Bendix ever spent any money on the health effects of asbestos during any time frame.  Therefore, we reject Honeywell's argument that the last paragraph of the Martin letter "had nothing to do with 'notice.'"[17]

In summary, we conclude that the Martin letter was circumstantial evidence relevant to the issues identified in the trial court's limiting instruction, which restricted use of the letter and other documents to "whether Bendix had notice of matters discussed in the statements and for impeachment."  In other words, the existence of the Martin letter made it more probable, rather than less probable, that Bendix's management was aware of the questions being raised about the safety of asbestos.

### 6.    *Prejudice: Governing Principles*

The admissibility of relevant evidence is subject to various statutory exceptions. (Evid. Code, § 351; see e.g., Evid. Code §§ 952 [lawyer-client privilege], 1200 [hearsay].)  The exception Honeywell raises in this appeal is set forth in Evidence Code section 352, which vests the trial court with discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  This exception to admissibility has not been interpreted to create hard and fast rules, but requires the trial

---

**16**    Rogers started working part-time for Bendix in 1944 and, after receiving his master's degree in chemical engineering, began working full-time in July 1951 as a resin development chemist.  Rogers received many promotions during the course of his employment with Bendix, including promotions to quality control manager (1956), assistant factor manager (1963), supervisory engineer for materials and processes, senior staff engineer (1980), and manager of product engineering (1981).  The deposition of Rogers was taken in 1984, while he was still employed by Bendix.

**17**    The term "notice" was many definitions.  (See Black's Law Dict. (9th ed. 2009) pp. 1164-1165.)  In this case, it was used by plaintiffs to refer to what Bendix knew.  For example, the reporter's transcript contains many instances where, in reference to the notice issue, plaintiffs' counsel addressed what Bendix knew and argued Bendix "knew that asbestos fibers could kill."

court to complete a weighing process (i.e., probative value versus undue prejudice) that considers the unique facts and issues of the case. (*Aguayo v. Crompton & Knowles Corp.* (1986) 183 Cal.App.3d 1032, 1038.)

The "undue prejudice" mentioned in Evidence Code section 352 refers to evidence which uniquely tends to evoke an emotional bias against the party as an individual and which has very little effect on the issues—it is not synonymous with "damaging." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) In general, evidence is substantially more prejudicial than probative if it creates an intolerable risk to the fairness of the proceedings or the reliability of the outcome. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

The trial court's determination of undue prejudice is subject to review under the abuse of discretion standard. (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 147.) When weighing probative value against the danger of prejudice, a trial court is deemed to have abused its discretion if its decision was arbitrary, capricious, or patently absurd and resulted in a manifest miscarriage of justice. (*Id*. at p. 150.) The circumstances the trial court may consider includes whether the trial court believes, based on the particular facts, that the jury can follow a limiting instruction about how the evidence in question may be used. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 598.) As a general rule, juries are presumed to follow a trial court's limiting instructions. (*Ibid*.) "Whether it would be impossible for a jury to follow limiting instructions is determined by the circumstances of each case, primarily in the trial court's discretion under Evidence Code section 352." (*Id*. at p. 599.)

### 7. *Analysis of Prejudice*

Honeywell argues that if the Martin letter was somehow relevant, it should have been excluded because of the danger of unfair prejudice. Honeywell contends the last

paragraph of the Martin letter[18] "was so prejudicial, and bore so little relevance to the case, that is should have been excluded."

Honeywell supports its argument of undue prejudice by citing two appellate decisions in which the Martin letter was admitted into evidence and the appellate court ordered a new trial. (See *Guilder*, *supra*, 23 So.3d at p. 870 [prejudice from Martin letter was one ground for granting new trial]; *Dukes*, *supra*, 900 N.E.2d at pp. 1134-1135, 1138-1139 [error to allow entire Martin letter into evidence as an admission by Bendix].)

Plaintiffs argue (1) the Martin letter was relevant to the dispute about notice of the hazards of airborne asbestos, (2) the limiting instruction protected against the improper use of the Martin letter, (3) the arguments of Honeywell's counsel to the jury undermined the limiting instruction and invited the jury to consider it for other purposes, and (4) the out-of-state cases relied upon by Honeywell are distinguishable because, among other things, they did not involve California law or a limiting instruction.

In response, Honeywell argues that the analyses in *Guilder* and *Dukes* applied basic principles of prejudice that apply equally in California and the limiting "instruction did not come close to diminishing the tendency of the letter to inflame the passion and prejudice of the jury." Honeywell notes the court did not instruct the jury to disregard the sarcastic statement in the Martin letter and, by telling the jury to consider the letter on the issue of notice, erroneously implied that the last paragraph was relevant to that issue.

Honeywell has a difficult task in carrying its burden of affirmatively demonstrating the trial court prejudicially abused its discretion for two main reasons. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [appellants must affirmatively demonstrate error].) First, the abuse of discretion standard is a deferential standard of

---

[18]    That paragraph stated: "My answer to the problem is: if you have enjoyed a good life while working with asbestos products why not die from it. There's got to be some cause."

review. Second, Honeywell must overcome the presumption that juries follow limiting instructions.

Based on the circumstances of this case, we reach the following conclusions. First, contrary to Honeywell's argument, the last paragraph was relevant to the notice issues presented in this case. Second, the limiting instruction and other factors distinguish this case from the analysis of prejudice adopted in *Guilder* and *Dukes*. Third, Honeywell has failed to overcome the presumption that the jury followed the trial court's limiting instruction.

As to the relevancy of the last paragraph, we conclude the paragraph was relevant to the disputed issues in this case because it showed Martin understood the assertions about the potential health hazards of airborne asbestos because he comments, albeit sarcastically, on the claim that asbestos can cause death. In *Dukes*, the court stated that the Martin "letter is a revealing historical anecdote that may give us insight into the thinking within the asbestos industry in 1966, but was irrelevant." (*Dukes*, *supra*, 900 N.E.2d at p. 1139.) Thus, the court recognized a trier of fact reasonably could infer from Martin's awareness of claim about health hazards related to asbestos that others working in the asbestos industry also were aware of the health claims. The court in *Dukes* was persuaded that "whatever probative value [the Martin letter] had was outweighed by its prejudicial effect." (*Ibid.*) This determination about probative value and prejudicial effect has little meaning outside the particular issues being litigated in *Dukes*. The decedent in that case had worked from 1954 to 1961 at a Union Asbestos & Rubber Company plant, but had never worked for Bendix and had never been exposed to asbestos from a Bendix product. (*Id.* at p. 1131.) The plaintiffs included Honeywell as a defendant on the theory that Bendix had engaged in a conspiracy with the other defendants. (*Ibid.*) They alleged the defendants had agreed to positively assert it was safe for people to work with asbestos and also had agreed to suppress information about the harmful effects of asbestos. (*Ibid.*) The plaintiffs also alleged the acts in furtherance

35.

of that conspiracy were a proximate cause of the decedent's illness and death. (*Ibid*.) The trial court allowed the Martin letter into evidence in its entirety as *an admission* by Bendix, which implies the trial court concluded the letter was evidence of the existence of a conspiracy. (*Id*. at p. 1135.)

The Illinois appellate court stated the Martin letter was "no more than a note from one business acquaintance to another and not an expression of corporate policy or proof of any conspiracy." (*Dukes*, *supra*, 900 N.E.2d at p. 1139.) Thus, the Martin letter was not offered in *Dukes* to show when Bendix became aware of claims that airborne asbestos was potentially hazardous to health, but was offered to support an inference that Bendix and its asbestos supplier, Johns-Manville, were engaged in a conspiracy to suppress information. The appellate court's determination that the Martin letter was irrelevant to proving a conspiracy does not bear directly on its relevance to the notice or awareness issue disputed in this case. Also, no limiting instruction was given in *Dukes*.

In the Florida case, the trial court denied Honeywell's motion in limine to exclude or redact the Martin letter. (*Guilder*, *supra*, 23 So.3d at p. 869.) The jury awarded damages of over $24 million the plaintiff and his children. (*Ibid*.) On appeal, Honeywell argued the trial court erred by (1) admitting the irrelevant, highly prejudicial Martin letter, (2) excluding nonparties from the verdict form that apportioned liability or fault among the entities who contributed to the injuries, and (3) allowing the children to recover for the loss of parental consortium. (*Ibid*.) As previously described, the appellate court in *Guilder*, like this court, concluded the Martin letter was relevant to the issue presented, stating: "Here, the Bendix employee's letter to an asbestos supplier written in the late 1960's was relevant to proving Honeywell's knowledge of the dangers of asbestos in its products." (*Id*. at p. 870.) The court then quoted the last paragraph of the Martin letter, found that portion was unfairly prejudicial, and concluded the trial court erred in refusing to redact that portion of the letter. (*Ibid*.) The court also agreed with

Honeywell's other two claims of error, reversed the judgment, and remanded for a new trial. (*Id.* at p. 871.)

In *Guilder*, the plaintiff's exposure to asbestos occurred in the 1970's and 1980's. In contrast, Phillips's first performed brake work in 1967, which increases the relevance (i.e., the probative value of the Martin letter), which affects one side of the scales in the weighing process (i.e., probative value versus undue prejudice) conducted under Evidence Code section 352. Furthermore, no limiting instruction was given in *Guilder*. These two factors are sufficient to distinguish *Guilder* and, along with our earlier analysis of the relevance of the last paragraph, lead us to conclude the trial court did not abuse its discretion by admitting the Martin letter into evidence.

B.   Expert Testimony on Causation

1.   *Contentions of the Parties*

Honeywell contends that the trial court erroneously allowed the jury to hear expert testimony on a speculative theory of causation. Honeywell argues that Dr. Brodkin's "every identified exposure" theory was indistinguishable for the every-exposure theory excluded by the trial court's ruling on a motion in limine.[19] In addition, Honeywell argues that Dr. Brodkin's testimony was inadmissible under *Sargon Enterprises Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*) and was legally invalid under *Rutherford*, *supra*, 16 Cal.4th 953.

Plaintiffs contend the trial court did not abuse its discretion by admitting Dr. Brodkin's opinion testimony about causation. They point out that the Second District rejected Honeywell's very same argument in *Davis*, *supra*, 245 Cal.App.4th 477— another appeal involving Bendix brakes and a decedent who developed mesothelioma.

---

**19**   Other common labels for the every-exposure theory are the "'any exposure'" theory and "any fiber" theory. (*Davis*, *supra*, 245 Cal.App.4th at p. 480.)

## 2. Standard of Review

Generally, a trial court's rulings relating to expert testimony is reviewed for an abuse of discretion. (*Sargon*, *supra*, 55 Cal.4th at p. 773.) In *Sargon*, the court stated: "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.'" (*Ibid.*; cf. *County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 316 [abuse of discretion occurs when lower court exceeds the bounds of reason].) In addition, the trial court's discretion "must be exercised within the confines of the applicable legal principles." (*Saragon*, *supra*, at p. 773.)

One set of legal principles applicable to the admission of expert testimony provides for the exclusion of "expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Saragon*, *supra*, 55 Cal.4th at pp. 771-772; see Evid. Code, §§ 801, 802.) Stated another way, "the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies." (*Id*. at p. 772.)

Another applicable legal principle that confined the trial court's discretion is our Supreme Court's special rule for proving causation in cases alleging asbestos-related cancer. "[T]he plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer." (*Rutherford*, *supra*, 16 Cal.4th at pp. 982-983.)

## 3. Ruling on Motion in Limine

Honeywell's third motion in limine requested an order precluding Dr. Brodkin "from presenting expert opinion testimony or argument that (1) each and every exposure

38.

to asbestos above so-called background levels, and (2) exposure to brake dust from Bendix brakes contributed to [Phillips's] mesothelioma." The trial court discussed the motion in limine with counsel and stated its "intention was to grant [regarding] the causation testimony of Carl Brodkin as it applied to the every contact theory."

Plaintiffs' counsel responded: "Yeah. I got to be real careful with this one, your Honor. [¶] I'm okay with that language. In other words, Mr. – or Dr. Brodkin will not stand up and say, 'Each and every exposure to asbestos caused his mesothelioma.' He will not say that. That's not his testimony." Counsel further stated that "we will go in great detail on direct on these particular exposures [relating to Bendix and Calaveras] and at what level do these exposures increase one's risk and cause disease." After counsel's statements, the trial court said, "Defendants – so my narrow ruling on this is I'm excluding testimony about every exposure or an every exposure theory." This ruling amounts to a determination by the trial court that it would be conjecture (not a reasonable medical certainty) for an expert to testify that every exposure to asbestos was a substantial factor contributing to the risk of Phillips developing cancer.

### 4. Dr. Brodkin's Testimony

During direct examination, Dr. Brodkin was asked whether it is possible to separate an exposure from a series of identified exposures and say one did not have anything to do with the disease and another one caused it. Dr. Brodkin answered:

> "No. There really isn't a scientifically valid way to do that, because in this case, the disease I came to diagnose was mesothelioma. That is what we call a dose-response disease. The greater the dose of asbestos, the greater the risk for a disease like mesothelioma.
>
> "So the identified exposures result in an increase in the body's burden of asbestos. And it's the cumulative exposure, all of those exposures that result in disease risk in terms of the identified exposure.
>
> "Now, there were many things in Mr. Phillips' history I did not identify. He had worked with installing boilers after 1974 that typically would not be asbestos-containing. He worked on valves and pumps in homes that were

39.

what we call ambient temperature. They weren't very hot. Those typically wouldn't be asbestos-containing.

"So many of his --- the materials he worked with, I did not identify. But in terms of the identified asbestos exposures, they would each contribute to Mr. Phillips' cumulative exposure that resulted in a disease like mesothelioma."

The exposures to Bendix brakes identified by Dr. Brodkin were based on the deposition testimony of Phillips. They included (1) the regular exposures during the period (1969-1971) Phillips worked as an automotive mechanic and averaged about one brake job per week and (2) the intermittent exposures from 1967 through the 1980's when Phillips worked on his personal vehicles and the vehicles of friends. Dr. Brodkin also considered how Phillips handled the brakes, how those activities created airborne asbestos, and what concentrations of airborne asbestos might be generated. Those activities included Phillips using an airhose to clean the residual brake dust from the brake drum, grinding the brakes with a hand file, and using sandpaper to edge the brakes and take off the glazing. Dr. Brodkin stated that Phillips's ability to see dust during his work was an indication of a very significant exposure, with a high concentration of asbestos per cubic foot of air.

Ultimately, Dr. Brodkin was asked whether Phillips's work with Bendix brakes over the course of his lifetime was a substantial contributing factor to the cause of his disease. Dr. Brodkin answered:

"Yes, it would be. Because it's an important … component of his entire cumulative exposure to asbestos. … [H]e was doing this professionally, regularly for a two-year period. He was doing it intermittently for almost a 20-year period between the late '60s through the 1980s. So it's an important component part of his cumulative exposure, and as such is a substantial contributing factor in his development of mesothelioma."

Also, Dr. Brodkin was asked whether every time someone is exposed to asbestos that exposure is a substantial factor in causing a disease. He answered, "No." He explained his answer by stating:

"I think the evidence strongly is against the notion that each and every asbestos fiber increases risk for disease. That's never been my opinion, and I don't think the science supports that. It takes significant exposures, for example, these exposures in an occupational setting, orders of magnitude higher than ambient levels, very high levels that overcome the body's defenses, add to the body's burden of asbestos that increases risk for disease."

Thus, Dr. Brodkin explicitly stated that his opinion was not based on an every-exposure theory.

### 5. *Distinction Between Every Exposure and Identified Exposures*

Honeywell describes the every-exposure theory of causation as stating that "every exposure to asbestos fibers is a substantial factor in causing disease, regardless of fiber type or dose, so long as the fibers are traceable to a product and are not merely 'background' fibers found in the ambient air." Honeywell contends that Dr. Brodkin's testimony about "every identified exposure" was the functional equivalent or indistinguishable from the every-exposure theory.

We reject Honeywell's argument that the every-exposure theory of causation is the equivalent of Dr. Brodkin's causation testimony about every identified exposure. Our rejection of that argument is based on the content of Dr. Brodkin's testimony, which is quoted or described in the previous section. We need not repeat that testimony in detail as it speaks for itself in describing how the identified-exposure theory is a more rigorous standard of causation than the every-exposure theory. As a single example of the difference, we note Dr. Brodkin's statement that it "takes significant exposures" to increase the risk of disease. This statement uses the plural "exposures" and also requires that those exposures be "significant." The use of "significant" as a limiting modifier appears to be connected to Dr. Brodkin's earlier testimony about the concentrations of airborne asbestos created by particular activities done by Phillips, such as filing, sanding and using an airhose to clean a brake drum.

41.

The foregoing evaluation of Honeywell's arguments about the every-exposure theory is not unique.  An appellate court in Ohio recently stated:

> "Contrary to Honeywell's position, Dr. Bedrossian's causation opinion was not premised on a rigid application of the "each and every exposure" theory.  Although some courts have rejected the "each and every exposure" theory, others have distinguished testimony suggesting a de minimis exposure to asbestos could cause mesothelioma from testimony that each significant exposure to asbestos could be a cause.  [Citation.]" (*Schwartz v. Honeywell International, Inc.* (Ohio App. 2016) 66 N.E.2d 118, 126.)

Similarly, the court in *Quirin v. Lorillard Tobacco Co.* (N.D.Ill. 2014) 23 F.Supp.3d 914, recognized a difference "between pointing to a minor exposure to asbestos and claiming causation in a conclusory fashion and identifying, through use of expert testimony, a significant and sustained exposure in the plaintiff's history." (*Id*. at p. 920; see *Robertson v. Doug Ashy Building Materials, Inc.* (La. App. 2014) 168 So.3d 556 [trial court erred in excluding expert's testimony that each "special exposure" to asbestos constituted a significant contributing factor in the development of decedent's mesothelioma and in prohibiting expert from giving definition to "special exposure"].)

### 6. Violation of Order Granting Motion in Limine

As a second contention of trial court error, Honeywell states the trial "court should have granted [its] motion to strike Dr. Brodkin's 'every *identified* exposure' testimony because it advanced the every exposure theory under a different name and thereby violated the court's order" granting Honeywell's motion in limine.

Our conclusion that there is a legitimate distinction between the every-exposure theory and the identified-exposure theory of causation presented in this case necessarily leads to the rejection of this contention.  Honeywell asserts, in effect, that the trial court violated its own order on the motion in limine by allowing Dr. Brodkin's testimony about causation resulting from every identified exposure.  Honeywell's interpretation of the court's order is not accurate.  The court itself described its ruling granting the motion as "narrow."  It is possible to interpret this narrowness as eliminating the every-exposure

42.

theory while still allowing Dr. Brodkin's testimony about the substantial, identified exposures that were experienced by Phillips.

Based on our conclusions that (1) Dr. Brodkin's opinion was not based on an every-exposure theory and (2) the trial court did not violate its own ruling by allowing that opinion testimony, we need not reach Honeywell's arguments that the analysis of the every-exposure theory adopted in *Davis* was wrong and should be rejected by this court.

IV.    SUFFICIENCY OF THE EVIDENCE: FAILURE TO WARN CLAIMS[*]

A.    Basic Principles Governing Warnings

Generally, manufacturers have a duty to warn consumers about the hazard inherent in their products. (*Webb*, *supra*, 63 Cal.4th at p. 181.)  The purpose of a warning is to inform consumers about hazards of which they are unaware, so that they can avoid the product or minimize the danger by careful use. (*Ibid*.)  "[L]iability for failure to warn is conditioned on the manufacturer's actual or constructive knowledge of the risk." (*Ibid*.)  Thus, a manufacturer "has a duty to warn about product risks that are known or knowable in light of available medical and scientific knowledge." (*Ibid*.)

California law recognizes separate failure to warn claims under strict liability and negligence theories. (*Webb*, *supra*, 63 Cal.4th at p. 181.)  In general terms, the elements of a strict liability cause of action based on a failure to warn are the failure to warn of a hazard inherent in the product, causation and injury. (*Nelson v. Superior Court* (2006) 144 Cal.App.4th 689, 695; see CACI No. 1205.)  The elements of a negligence claim against a manufacturer for failing to warn of a product's dangers also include causation and harm. (CACI No. 1222.)  The differences in the elements of each theory is not relevant to this appeal.

_____

[*]    See footnote, *ante,* page 1.

43.

B. Contentions of the Parties

1. *Honeywell's Contentions*

Honeywell contends it is entitled to judgment as a matter of law because plaintiffs failed to prove that a different or better warning would have made a difference. Proof that a warning would have made a difference addresses the causation element and establishes a link between the failure to give a warning and the injuries. (See *Huitt v. Southern California Gas Co.* (2010) 188 Cal.App.4th 1586, 1602.) Honeywell argues proof of the causation element is missing in this case:

> "Plaintiffs' counsel never asked Phillips to say he would have changed his behavior in response to different instructions or warnings from Bendix. It was their burden to prove that point .… The record indicates that Phillips could not honestly say he would have heeded the warning advocated by plaintiffs."

Honeywell contends Phillips's attitude towards instructions and warnings was established by his decisions to start and continuing smoking despite the warnings on cigarette packages and by his testimony stating, "I never read instructions. You're a man; you know how it is." In Honeywell's view, this testimony shows conclusively that Bendix could not have changed Phillips's behavior by providing warnings because Phillips would not have read and followed them.

2. *Plaintiffs' Contentions*

Plaintiffs contend that Honeywell's challenge to the sufficiency of the evidence is reviewed under the substantial evidence standard and, as a result, plaintiffs are entitled to have all evidentiary conflicts resolved in their favor and receive the benefit of every reasonable inference. Plaintiffs contend the evidence allowed the jury to reasonably infer that if Bendix had provided an adequate warning about the hazards of asbestos in its brakes, Phillips would have taken steps to avoid exposure to asbestos.

In plaintiffs' view, Phillips's testimony about not reading instructions can be interpreted in various ways and Honeywell's interpretation takes his testimony out of

context and violates the rule requiring favorable inferences. Similarly, plaintiffs argue the inferences drawn by Honeywell from Phillips's cigarette smoking and his attempts to stop are inappropriate because they are not the inferences most favorable to the jury's findings.

C.    Sufficiency of the Evidence:  Standard of Review

When reviewing challenges to the sufficiency of the evidence, this court has abided by the well-established principle that "all factual matters must be viewed most favorably to the prevailing party and in support of the judgment."  (*Jimenez v. Pacific Western Construction Co.* (1986) 185 Cal.App.3d 102, 111.)  When two or more inferences can be deduced reasonably from the evidence presented, a reviewing court is without power to substitute its deductions for those of the trier of fact.  (*Ibid*.)  Consequently, the power of the appellate court begins and ends with the determination as to whether there is any substantial evidence supporting the jury's finding of fact.  (*Ibid*.)  Evidence is "substantial" for purposes of this standard of review if it is of ponderable legal significance, reasonable in nature, credible and of solid value.  (*Id*. at pp. 111-112.)  In sum, plaintiffs get the benefit of every reasonable inference that can be drawn from the evidence and all conflicts in the evidence are resolved in their favor.  (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935.)

D.    Phillips's Cigarette Smoking

Dr. Brodkin testified that there is a strong association between cigarette smoking and lung cancer, but there is no association between smoking and mesothelioma. Honeywell does not contend the jury should have found Phillips's smoking was a cause of his mesothelioma, but argues the jury should have inferred Phillips would have ignored asbestos warnings on brake packaging as he ignored the warnings on the cigarette packaging.[20]

_____

[20]    In 1965, Congress enacted a statute requiring the following warning to appear on all cigarette packages:  "'Caution:  Cigarette Smoking May Be Hazardous to Your

45.

### 1. *Phillips's Testimony*

Phillips began smoking when he was 17 years old and still in high school. He smoked Marlboro, a brand of filtered cigarette. He attempted to quit four times and last smoked in September 2011, before he was diagnosed with mesothelioma. Phillips saw the warning label on the cigarettes when he started smoking and also saw the warning label each time he started smoking again after he had quit. As to quantity, Phillips stated he smoked about three quarters of a pack a day and was never a pack-a-day guy. During the time Phillips smoked, no doctor ever told him to stop.

### 2. *Inferences Reasonably Drawn from Testimony*

Honeywell argues that Phillips's testimony shows that he saw warnings on cigarette packages and ignored them when he decided to smoke and continued to ignore the warnings throughout his life when he restarted smoking. Plaintiffs offer a different interpretation of the testimony about smoking cigarettes. They contend the testimony shows that Phillips followed the warnings by attempting to quit smoking four times, even before a doctor told him to quit. Plaintiffs argue the fact Phillips was unsuccessful in stopping does not conclusively establish the inference that he ignored the warnings as to cigarettes or, more generally, ignored warnings of all types.

Honeywell's reply brief argues that plaintiffs have drawn the wrong inference from the testimony about Phillips smoking cigarettes. Honeywell contends:

---

Health.'" (*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.* (2000) 529 U.S. 120, 148.) In 1969, the federal statute was amended to require the following warning or a variation of it: "'WARNING: THE SURGEON GENERAL HAS DETERMINED THAT CIGARETTE SMOKING IS DANGEROUS TO YOUR HEALTH.'" (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 508.) This is the label Phillips would have seen when he began smoking around 1970. In 1984, a further amendment required four more explicit warnings, used on a rotating basis. (*Id.* at p. 508, fn. 1.) The current statute has nine variations of the warning. (See 15 U.S.C. § 1333(a)(1).)

"That testimony further confirms he did *not* heed product warnings. He testified that *before he started* smoking cigarettes he saw the warnings on the packages and smoked anyway. [Citation.] A jury could not reasonably infer that Phillips, who smoked cigarettes knowing that they cause lung cancer, would have chosen not to work with brakes if he had been informed about the purported, theorized connection between brakes and mesothelioma."

Honeywell argues that Phillips's statements that he attempted to quit four times is not evidence that he heeds warnings because no evidence was offered linking his decision to stop smoking with the product warning labels. Stated another way, Honeywell argues there is no direct evidence as to why Phillips attempted to stop smoking and the jury could not reasonably infer the health hazards mentioned in the warning labels were a motivating factor for his attempts to quit.

### 3. Comparing Cigarettes to Brakes

The foundation for our examination of the reasonable inferences that can be drawn from Phillips's testimony about his smoking cigarettes begins with a comparison of the two products and their characteristics.

First, a reason a consumer lights a cigarette and creates airborne particles in the form of smoke is to allow those particles to contact tissue in the consumer's mouth and lungs. In contrast, the purpose of changing brakes is not to create airborne particles that can be inhaled for the satisfaction of the consumer, but is to maintain a vehicle in safe operating condition.

Second, cigarettes are distinguishable from brakes because cigarettes are addictive. Evidence that cigarettes are addictive was not presented at trial, but this characteristic of cigarettes has become common knowledge. First, the federal requirements for the labeling of cigarette packaging include the statement: "WARNING: Cigarettes are addictive." (15 U.S.C. § 1333(a)(1).) Second, in 1999, Philip Morris issued a statement that acknowledged cigarette smoking is addictive. (*Bullock v. Philip*

47.

*Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 555.)[21]  These sources are sufficient for this court to regard the addictive quality of cigarettes as within the common knowledge of the jurors and, thus, appropriately considered by them.

Automotive brakes in general and asbestos-containing brakes in particular do not share this characteristic with cigarettes.  No statute, case law, or evidence in the record suggests that removing and installing brakes was addictive or, alternatively, that breathing the particles that become airborne during the various steps for removing old brakes and installing new brakes is addictive.

Bearing in mind that cigarettes (1) involve the intentional inhalation of smoke and (2) are addictive, we turn to the reasonable inferences that can be drawn from Phillips's decision to smoke and his four attempts to quit smoking.  The particular inferences discussed pertain to how Phillips might have reacted to warnings about the risks associated with the asbestos in Bendix brakes.

### 4. Relationship Between Warnings and Attempts to Quit Smoking

The first dispute about reasonable inferences relates to whether a jury could infer that the warning labels about the health hazards of cigarette smoking were a factor in motivating Phillips's four attempts to quit smoking.  We conclude such an inference is reasonable in this case.

Jurors' evaluation of the evidence is informed by their life experience, but they are not to inject their personal expertise or specialized knowledge into that evaluation. (CACI No. 5009; *In re Malone* (1996) 12 Cal.4th 935, 963.)  Similarly, jurors may give effect to such inferences as common knowledge allows to be reasonably drawn from facts

---

**21**     We recognize that the tobacco industry has not always admitted cigarettes are addictive.  In *Whiteley v. Philip Morris Inc.* (2004) 117 Cal.App.4th 635, the plaintiff submitted a 1988 press release from the Tobacco Institute titled "Claims That Cigarettes Are Addictive Contradict Common Sense" as an exhibit.  (*Id.* at p. 662.)

directly proven. (75B Am.Jur.2d (2016) Trial, § 1413; see Evid. Code, § 801, subd. (a) [expert testimony not allowed on subject within common experience of jurors].)

In this case, Phillips's testimony about his attempts to quit smoking was elicited in connection with questions about the warning labels on cigarette packages. Given this context, one of the inferences that a jury could reasonably draw from the testimony was that the health concerns referred to the warnings on the cigarette packages were considered by Phillips and, thus, were a factor motivating his attempts to quit smoking. Consequently, under the applicable rules of appellate review, we are required to conclude the jury drew this inference. Accordingly, we reject Honeywell's argument that Phillips's *returns* to smoking after attempts to quit conclusively establish that he disregarded warning labels and, more specifically, would have disregarded any warning placed on boxes containing Bendix brakes. The rejection of this argument also is supported by the fact that cigarettes are addictive and the jury reasonably could have inferred that Phillips's returns to smoking were caused more by cigarette's addictive qualities than Phillips's cavalier attitude towards health risks.

> 5. *Relationship Between Warnings and Decision to Start Smoking*

The next dispute about reasonable inferences relates to Phillips's decision to *start* smoking, which we analyze separately from his decisions to return to smoking after attempts to quit. We conclude his decision to start smoking does not compel the inference that Phillips would not have followed warnings that would have significantly reduced his inhalation of asbestos fibers.

Phillips testified that he started smoking despite the warning labels on cigarette packages. This testimony provides an example of a situation where Phillips was made aware that an activity posed potential health risks and he decided to engage in that activity anyway. However, Phillips's decision to start smoking did not compel the jury to infer that Phillips would not have followed warnings relating to asbestos in Bendix

brakes.  The warning about the health risks associated with smoking relates to the threshold decision of whether to smoke, an either-or decision.  This threshold decision weighs the personal satisfaction derived from smoking against the health risks of smoking.  Personal satisfaction—the reason for consuming a cigarette—could not have been achieved without assuming the risk that is the subject of the warning—namely, inhaling tobacco smoke.

In contrast, the safety risks associated with the threshold decision to work with asbestos-containing brakes are different because the primary goal of the activity is a vehicle with new brakes—a goal that can be achieved while heeding warnings for minimizing the installer's exposure to airborne asbestos fibers.  Phillips's testimony showed that the removal and installation of brakes involved many steps and the techniques used to complete those steps affected the amount of asbestos-containing dust created.  As a result, an adequate warning about the health hazards posed by asbestos in brakes and how to avoid exposure to airborne asbestos fibers could be followed *and* the goal of a vehicle with new brakes achieved.  (See *Webb*, *supra*, 63 Cal.4th at p. 181 [adequate warnings inform consumers about hazards and allows them to minimize the danger by careful use].)  The differences between the purpose or goal of smoking and the purpose or goal of installing brakes weakens the inference that Phillips reaction to a warning on the boxes of Bendix brakes would have been the same as his reaction to the warning on cigarette packaging when he started smoking.  The cigarette-brake comparison is not apples to apples, but closer to comparing apples to orangutans.

In summary, we conclude the balancing done by a person who decides to accept the health risks associated with smoking cigarettes in return for the personal satisfaction derived from the tobacco is distinguishable from the decisions made by a person who removes and installs brakes.  The various steps of removing and installing brakes can be completed while implementing measures that reduce the airborne asbestos generated and, thus, the attendant health risks.  Based on this distinction, the jury reasonably could

50.

conclude Phillips's decision to smoke and decisions to start smoking after quitting did not support the inference that Phillips would not have followed adequate warnings about (1) the health hazards of asbestos and (2) how to minimize the risks when handling asbestos-containing brakes. In addition, Phillips's attempts to quit smoking reasonably support the inference that Phillips would have attempted to comply with a warning's recommendation for how to minimize the risks of handling asbestos-containing brakes.

### E. Pipe Cutting Warning

#### 1. *Phillips's Testimony*

During Phillips's deposition, he testified about his employment for Mariposa High School and working with asbestos cement pipe. His testimony described how he cut the pipe and included the following exchange:

"Q. If [the pipe] said, 'Warning, do not cut,' what would you have done?

"A. I would ask my boss what to do.

"Q. Okay. But otherwise, it was your job to install this pipe, which required cutting, so you would have done your job; right?

"A. I would have done my job."

The parties interpret this testimony differently as it relates to how Phillips might have reacted to a warning provided with the Bendix brakes.

#### 2. *Arguments About Inferences*

Honeywell argues that Phillips's testimony about the hypothetical warning on asbestos-containing pipes "proves only that Phillips would have followed his employer's instructions, not anything printed on a warning. In other words, only directions from his employer, not a warning on the pipe, could have changed Phillips's behavior." Honeywell interprets this and other testimony to mean that when Phillips made decisions for himself, "he did not read or follow warnings or instructions."

51.

Plaintiffs contend Phillips's testimony is another instance—like his attempts to quit smoking—where he would take action consistent with the warning, rather than ignoring it. The trial court discussed the hypothetical about the warning on the pipe and concluded the warning would cause Phillips to do something other than cut the pipe because asking his employer what to do was not the same as cutting the pipe. Based in part on this analysis of Phillips's testimony, the court denied Honeywell's motion for a directed verdict on the failure to warn theory.

### 3. *Inferences Reasonably Drawn from Testimony*

First, we consider Honeywell's claim that it proved Phillips did not *read* warnings. The hypothetical posed to Phillips and his response tends to show that he would read a clearly visible warning on products he handled during his employment. Phillips's statement that he would ask his boss what to do implies that he would read the warning rather than stop reading once he saw the word "warning." The inference that Phillips would read a product warning also is supported by his testimony that he *saw* the warning on cigarettes packages, which the jury reasonably could interpret to mean that Phillips *read* the warning.

Second, we consider whether Phillips's testimony about the hypothetical do-not-cut warning compels the inference that he did not *follow* warnings. Like the trial court, we conclude the jury reasonably could infer that Phillips would not simply ignore warnings, but instead would seek further information. The warning in the hypothetical was narrowly worded. It did not specify whether the prohibition of cutting was related to product performance, worker safety, some other concern, or a combination of these considerations. Faced with this uncertainty about the reason for the warning, Phillips's actions in going to his boss to obtain more information was reasonable. That reasonable action cannot be equated to ignoring the warning. Therefore, Phillips's testimony about what he would have done does not compel the inference that he always ignored warnings

52.

or, more specifically, that he would have ignored a warning on the packaging for Bendix brakes.

F.       Phillips's Testimony About Instructions for Brake Installation

      *1.      Phillips's Testimony*

During Phillips's deposition, he was asked if he recalled the packaging of Bendix brakes changing in a significant way over the years. Phillips's answered that he could not remember. The following exchange occurred:

"Q.     Okay. When you opened the box of the brake shoes, what – what was inside?

"A.     Brake shoes.

"Q.     Anything else other than the brake shoes?

"A.     Usually, they would be stacked, you know, on top of each other.

"Q.     Okay.

"A.     And –

"Q.     Was there any literature or instructions or anything like that?

"A.     You know, I couldn't tell you.

"Q.     Okay. Would you –

"A.     I never read instructions. You're a man; you know how it is."

The parties dispute how this testimony should be interpreted and what reasonable inferences drawn can be drawn from it. Part of the background for their dispute is provided by Cohen's testimony that Bendix did not place anything inside the boxes. Consequently, the foregoing questions about instructions that might have been placed in boxes of Bendix brakes were hypothetical in nature and relate to whether warnings would have changed Phillips's behavior.

## 2. *The Parties' Interpretations*

Honeywell interprets Phillips's testimony that "I never read instructions" to mean that Phillips categorically never read any instructions or warnings. Honeywell supports this interpretation by arguing Phillips did not qualify his testimony, but flatly said he never read instructions. Based on this interpretation, Honeywell contends any absence of a warning about asbestos did not cause Phillips's illness because any warning given would not have been read and would not have changed Phillips's behavior.

Plaintiffs dispute this interpretation. They begin by arguing the never-read-instructions statement must be placed in the specific context of the questions about instructions inside boxes containing Bendix brakes. In that context, they argue that the statement can be interpreted to mean that Phillips never read any instructions placed inside a box containing Bendix brakes and explain this interpretation by noting "he already knew how to perform brake jobs and, therefore, did not need instructions on how to do them." Plaintiffs also contend that Honeywell has misinterpreted the reference to *instructions* as including *warnings* even though the jury reasonably could have interpreted the testimony to mean that Phillips regarded instructions as different from warnings.

## 3. *"Read": Past or Present Tense*

The first question of interpretation we address is an ambiguity that arises because Phillips's testimony was presented to this court in written form, not as a sound recording. From the written record, we cannot ascertain how Phillips pronounced the word "read." He might have used the present tense of the verb "read" and pronounced it the same as the word "reed." Alternatively, he might have used the past tense and pronounced it the same as "red." The parties' briefing does not address this ambiguity. Honeywell's descriptions of the testimony do not consistently indicate which tense was used, but Honeywell's reply brief states: "He said flatly that he *never* read instructions." In this

54.

statement, "read" is pronounced the same as "red" and, thus, is used in the past tense. Based on Honeywell's description and the rule that evidence must be viewed most favorably to the prevailing party (see pt. IV.C., *ante*), we interpret Phillips's use of the word "read" as being in the past tense.

### 4. Categorical or Limited

The second question of interpretation is whether the statement "I never read instructions" was meant as a categorical declaration or as a description limited to Phillips's actions when handling brakes. Honeywell's view that the jury was required to interpret the four-word sentence as a categorical statement is unpersuasive.

Generally, it is reasonable to interpret written or spoken words by referring to the context in which they were communicated. (See *Taylor v. Dept. of Industrial Relations* (2016) 4 Cal.App.5th 801, 811 [statutory construction]; *Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916, fn. 7 [contractual interpretation].) Honeywell has cited no case law rejecting this approach and requiring that statements by a witness be considered in isolation. In another case involving asbestos-related mesothelioma and the interpretation of testimony, the appellate court stated: "First, we conclude that Dr. Holstein's testimony, *when considered in context*, can and should be interpreted to refer to exposures for which Crane alone is liable." (*Paulus v. Crane Co.* (2014) 224 Cal.App.4th 1357, 1365, italics added.) Also, even the testimony of a plaintiff—a person with a strong interest in the outcome of the litigation—is considered in context when an appellate court addresses how a reasonable trier of fact could have interpreted that testimony. (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1256.)

Therefore, we reject Honeywell's approach and conclude we must consider how the jury could have reasonably interpreted the statement "I never read instructions" in the context in which it was made. The subject being discussed immediately prior to the statement was the packaging of Bendix brakes, what Phillips did when he opened a box

containing Bendix brakes, and whether any instructions were included. As to the question about the inclusion of any instructions, Phillips responded, "You know, I couldn't tell you." Before the next question was completed, Phillips interjected, "I never read instructions. You're a man; you know how it is." In this context, it is reasonable to interpret Phillips's statement "I never read instructions" as a modification of his prior statement that he could not say whether or not the box of Bendix brakes contained instructions. While Phillips could not say with certainty that there were no instructions, he was confident he never read any instructions that might have been included in the box of Bendix brakes. This interpretation is reasonable and supports the judgment. Therefore, we conclude this is the interpretation adopted by the jury.[22]

The foregoing interpretation is not eliminated from the range of possible reasonable interpretations by Phillips's subsequent statement, "You're a man; you know how it is." It is reasonable to interpret this statement about the behavior of men as an explanation for why Phillips (1) could not state with certainty whether or not the boxes of Bendix brakes contained instructions and (2) could state with confidence that he never read any instructions about how to install Bendix brakes. "You're a man; you know how it is" reasonably can be interpreted as the follows: "Look, Mr. Attorney, you are an adult male and you know that adult males do not read instructions for tasks they already know how to do." Phillips could have communicated the same idea by stating, "I never read instructions for installing brakes because it would have been a waste of time. I am as familiar with installing brakes as I am with driving and, like men everywhere, I do not read my car's operator's manual before going for a drive. That's why I did not read

---

[22] Alternatively, we note that if Phillips had used the present tense of "read," the jury reasonably could have interpreted the statement as "I never read instructions *about brake installation because I learned how to install brakes when I was 14 years old.*" In so doing, the jury would have rejected Honeywell's categorical interpretation of the statement as meaning "I never read *any kind of* instructions *ever.*"

instructions before installing brakes."  This interpretation of Phillips's testimony is among the interpretations that are (1) reasonable and (2) favorable to the plaintiffs and the judgment.  Therefore, we are compelled by applicable law to conclude it is the interpretation adopted by the jury.

### 5.    *Instructions versus Warnings*

The third question of interpretation we address is presented by plaintiffs' argument that Honeywell has inappropriately interpreted Phillips's statement about not reading "instructions" as encompassing warnings.  We conclude (1) the word "instructions" is ambiguous and (2) it is reasonable to interpret it narrowly so that it excludes warnings.  This interpretation provides an additional ground for rejecting Honeywell's argument that the jury was compelled to interpret the statement "I never read instructions" as a statement by Phillips of a personal, life-long policy of never reading *warnings*.

### G.    Summary of Reasonable Inferences

Phillips's testimony about his smoking and attempts to quit, his testimony about the hypothetical warning on the transite pipe, and his testimony about instructions that might have been included in the boxes containing Bendix brakes provide an adequate evidentiary basis (albeit circumstantial) for inferring that Phillips would have taken note of, and attempted to comply with, an adequate warning about the health hazards of asbestos and how to reduce the risks of handling asbestos-containing brakes.

### H.    Failure to State All Material Facts

Where an appellant challenges the sufficiency of the evidence, we may consider the appellant's failure to present all material facts as forfeiting that challenge.

An appellant challenging the sufficiency of the evidence to support a particular finding must summarize the evidence on that point, favorable and unfavorable, and show how and why it is insufficient.  (*Hong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.)  Stated another way, an appellant who argues the evidence is insufficient has a duty

to set forth a fair and adequate statement of the evidence that is claimed to be insufficient. (*Ibid*.) The appellant cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked this duty. (*Ibid*.) Accordingly, when an appellant omits unfavorable evidence, the appellate court may consider the argument about the insufficiency of the evidence forfeited. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

In this appeal, Honeywell's omission or mischaracterization of material, unfavorable evidence provides a separate and independent ground for our decision to reject its arguments relating to the insufficiency of the evidence, both as to the failure to warn and as to malice for punitive damages. An exhaustive list is not necessary here and providing such a list would defeat the judicial-efficiency purpose of the rule. Two examples are enough to illustrate the point.

Honeywell stated the following about Phillips's cigarette smoking: "He quit for the fourth and final time in 2012. (5 AA 1256.)" This description of Phillips's testimony is based on his statement that he quit in "September of this year" and his "Yeah" answered when asked, "September 2012 or – yeah, 2012?" Honeywell's statement is inaccurate because it does not reflect Phillips's correction set forth two pages later in the record. There, Phillips stated for the explicit purpose of correcting his earlier testimony, "Well, when we said 'September,' I meant September of last year." The deposition was taken in September 2012, so his reference to "last year" meant 2011. Therefore, Honeywell's assertion that he quit smoking for the final time in 2012 is not accurate and omits material evidence unfavorable to Honeywell. The fact that Phillips quit smoking in 2011 is material because it supports inferences that are unfavorable to Honeywell's position about the effect of warning labels on Phillips.

Honeywell's briefs also omitted a description of the March 1966 article published in the New York Times and titled, "Asbestos Dust Called a Hazard To at Least One-Fourth of U.S." (Boldface omitted.) This article, which was admitted into evidence as

58.

trial exhibit 376, is material evidence unfavorable to Honeywell's assertions about Bendix's unawareness of the dangers of asbestos dust. Honeywell apparently thought the article and similar evidence was not material based on its theory that Bendix did not believe its finished product—as opposed to the individual ingredients—presented an actual, nontrivial danger to users. We reject this narrow approach to materiality. Evidence about the dangers of unprocessed asbestos are relevant to whether it was reasonable not to research the dangers posed by the asbestos in the resin in Bendix's final product. Also, an article from a major newspaper in the state where the Troy facility was located is circumstantial evidence that tends to show management of Bendix was aware of the potential health risks of asbestos.

V.      SUFFICIENCY OF THE EVIDENCE OF MALICE[*]

      A.      Basic Principles of Law

            *1.      Statutory Provisions*

Subdivision (a) of Civil Code section 3294 provides that in tort actions, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff … may recover damages for the sake of example and by way of punishing the defendant." The statute defines "malice" to include "*despicable conduct* which is carried on by the defendant with a *willful and conscious disregard* of the rights or *safety of others*." (Civ. Code, § 3294, subd. (c)(1).) "Oppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).) As this case is concerned primarily with safety, our discussion is focused on malice rather than the other grounds for imposing punitive damages.

---

[*]      See footnote, *ante,* page 1.

### 2. Rules Applied to Unintentional Torts

Under Civil Code section 3294, "punitive damages sometimes may be assessed in unintentional tort actions." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1004.) The commission of a tort under principles of negligence or products liability, standing alone, is insufficient for awarding punitive damages. (See *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 894 [driving while intoxicated might, but does not necessarily, constitute malice].) "'There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, *or such a conscious and deliberate disregard of the interests of others that [the defendant's] conduct may be called wilful or wanton*.'" (*Id*. at pp. 894-895.)

### 3. Standard of Review

Challenges to the sufficiency of the evidence supporting a jury's finding of malice under Civil Code section 3294 are reviewed to determine whether substantial evidence supports the finding. (*In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 601.) The substantial evidence standard is applied by the appellate court despite the standard of proof being clear and convincing evidence. (*Id*. at pp. 601-602; cf. *People v. Mosher* (1969) 1 Cal.3d 379, 395 [substantial evidence standard of review applies where burden of proof applied by jury was guilt beyond a reasonable doubt].)

### B. Denial of Summary Adjudication

Honeywell moved for summary adjudication of plaintiffs' claim for punitive damages. The trial court denied the motion, citing *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68 (*Bankhead*) as a case where punitive damages were upheld based on a company's prolonged failure to take adequate measures to protect people who worked with its product against a known hazard to their health. Here, the trial court stated a triable issue of fact existed "because there is evidence [Bendix] knew that asbestos was hazardous and provided precautions to its 'customers' of record but didn't provide

precautions to individual users of Bendix brakes until legally required to do [so] in 1973, despite knowing of the risks in 1968."

### C. Jury's Findings and Award of Punitive Damages

The trial court instructed the jury on the elements that plaintiffs were required to prove to obtain an award of punitive damages, which included proving by clear and convincing evidence that Bendix engaged in conduct that constituted malice, oppression or fraud. The instructions stated that malice included conduct that "was despicable and was done with a willful and knowing disregard for the rights or safety of another." The instructions explained, "A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his or her conduct and deliberately fails to avoid those consequences." (CACI No. 3946.) Despicable conduct was described as "conduct that is so vile, base or contemptible that it would be looked down on and despised by reasonable people."

Question 15 of the special verdict asked the jury: "Do you find by clear and convincing evidence that Bendix, through one or more of its officers, directors, or managing agents, acted with malice or oppression in the conduct upon which you base your finding of liability?" In a nine-to-three vote, the jury answered "Yes."

As a result of this finding, a second phase of the trial was conducted to determine the amount of punitive damages. The jury awarded $3.5 million. Consequently, the punitive damages constituted slightly less than 60 percent of the total judgment of $5,876,540 entered against Honeywell. Stated another way, the punitive damages awarded were about 1.5 times the compensatory damages for which Honeywell was responsible.

### D. Contentions of the Parties

Honeywell contends that "the punitive damages should be stricken because plaintiffs failed to prove that Bendix acted with malice or oppression by consciously

61.

disregarding a known risk associated with its specific product." Honeywell argues "decades of scientific studies have found that even career auto mechanics experience no increased risk of mesothelioma from working with brakes manufactured using chrysotile. A company does not act with malice by failing to protect against harm that most experts do not believe exists."

Plaintiffs contend that (1) malice in a product liability action is established by a conscious disregard for customer safety and (2) the evidence in this case showed Bendix knew about the dangers of asbestos and failed to take adequate measures to protect its customers. Plaintiffs characterize Honeywell's arguments as a simple disagreement with the jury's factual findings and not a sufficient ground for vacating the award of punitive damages.

E.     Recent Asbestos Cases Upholding Awards of Punitive Damages

Part of the context for evaluating the parties' contentions about whether malice was proven is provided by cases involving mesothelioma caused by asbestos where punitive damages were awarded. In the following recent decisions, the finding of malice was upheld and the award of punitive damages affirmed.

In *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270 (*Pfeifer*), a boiler technician brought negligence and strict liability claims against a company that manufactured and distributed products containing asbestos. (*Id.* at pp. 1280-1281.) The boiler technician alleged his mesothelioma was caused by exposure to the company's asbestos-laden products. (*Id.* at p. 1280.) The jury found over $7 million in economic and noneconomic damages and awarded $14.5 million in punitive damages. (*Id.* at pp. 1283-1284.) The company challenged the award of punitive damages on various grounds, including that there was insufficient evidence of malice or oppression or, alternatively, "its conduct was insufficiently reprehensible to support the $14.5 million punitive damages award." (*Id.* at pp. 1301, 1311.) The company contended the evidence

of malice or oppression was insufficient because evidence supported the inference that it had sold its products with a good faith belief that they were safe.  (*Id*. at p. 1301.)  The company argued it reasonably believed the bonding agents in its products fully encapsulated the asbestos fibers; no specific study showed its products were unsafe; and its failure to test the products was consistent with industrywide practices.  (*Ibid*.)  The appellate court rejected these arguments, concluding the company "knew that its customers used the products in ways capable of generating dangerous levels of asbestos dust, yet it neither attempted to determine such levels nor issued warnings."  (*Id*. at pp. 1301-1302.)

In *Bankhead*, *supra*, 205 Cal.App.4th 68, a man who worked at automotive maintenance facilities for a period of 30 years was diagnosed with mesothelioma.  (*Id*. at p. 73.)  He and his wife sued a number of manufacturers of asbestos-containing brake linings and brake shoes.  (*Id*. at p. 74.)  The jury found against all defendants as to liability and punitive damages.  (*Ibid*.)  ArvinMeritor, a brakeshoe manufacturer, was held liable for approximately $1.8 million in compensatory damages and $4.5 million in punitive damages.  (*Id*. at pp. 74, 76.)

The evidence showed that (1) by the 1960's, ArvinMeritor knew workers exposed to asbestos dust were at risk for developing asbestos-related disease; (2) it did not place any warnings on its products until the early 1980's; and (3) the warnings on its products did not reference cancer until the fall of 1987.  (*Bankhead*, *supra*, 205 Cal.App.4th at p. 73.)  ArvinMeritor did not dispute the sufficiency of the evidence to support the finding it was liable for punitive damages, but challenged the amount of the award as excessive.  (*Id*. at pp. 76, 84)  In discussing the reprehensibility of the manufacturer's conduct, the appellate court stated:

> "While there is no evidence that ArvinMeritor intended to injure [the
> plaintiff] or anyone else in particular, its prolonged failure to take adequate
> measures to protect people who worked with its products against a known
> hazard to their health and safety justifies the jury's conclusion that its

conduct towards workers exposed to the hazards in its products was malicious, fraudulent, or oppressive." (*Id*. at p. 86.)

In *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962 (*Izell*), the owner of a residential construction business was diagnosed with mesothelioma and sued more than 20 manufacturers or suppliers allegedly responsible for the asbestos-containing products to which he was exposed. (*Id*. at p. 967.) Five defendants, including Union Carbide, went to trial. (*Ibid*.) The jury awarded $30 million in compensatory damages and apportioned 65 percent of the responsibility to Union Carbide. (*Ibid*.) Only Union Carbide remained for the punitive damages phase and the jury awarded $18 million. (*Id*. at p. 968.) The trial court issued a remittitur reducing the compensatory damages from $30 million to $6 million, which the owner and his wife accepted, and allowed the punitive damages award to stand. (*Ibid*.) The appellate court affirmed the award of punitive damages, concluding the evidence was sufficient to support the verdict. (*Id*. at p. 966.)

The majority in *Izell* determined the evidence showed "Union Carbide acted with reprehensible indifference to the health and safety of others." (*Izell*, *supra*, 231 Cal.App.4th at p. 985.) The supporting evidence included (1) a 1967 internal report concluding that low levels of exposure to asbestos could cause mesothelioma and (2) a 1968 report of Union Carbide's associate medical director stating, "'[i]t is generally held that much less exposure to asbestos increases the possibility of mesothelioma formation'" and advising admitting asbestos was carcinogenic under certain conditions. (*Id*. at p. 986.) Despite these reports, Union Carbide chose not to warn its customers about the risk of cancer. (*Ibid*.)

F.    Evidence of Honeywell's Reprehensible Conduct

Honeywell's challenge to the award of punitive damages raises the issue of whether substantial evidence supports a finding that Bendix engaged in despicable conduct involving a willful and conscious disregard of the safety of others. (Civ. Code, §

3294, subd. (c)(1) [definition of malice].)  In accordance with the jury instructions about a knowing disregard, we consider whether the evidence supports a finding that Bendix was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid those consequences.

### 1. *Awareness*

The record contains a variety of direct and indirect evidence about Bendix's awareness of health risks associated with asbestos in general and with the type of asbestos (chrysotile) used at its Troy facility to manufacture brakes.  This evidence includes Cohen's testimony about regulations implemented by the State of New York in 1956 that set a maximum allowable concentration of airborne asbestos.  Bendix's awareness of the risk that asbestos would cause disease and that this risk extended to chrysotile used in its brakes also can be inferred from the fact that, sometime during the 1950's, Bendix began giving employees at the Troy facility annual chest x-rays.

Despite the dust control mechanisms Bendix implemented at the Troy facility in the 1940's, the New York regulations adopted in 1956, the program of chest x-rays for Bendix employees adopted in the 1950's, and the March 1966 New York Times article, Cohen testified awareness occurred in 1968.  Cohen was asked about "the first time that Bendix had any indication that asbestos could cause disease in any context," he answered that he was not sure what "in any context" meant, but stated a 1968 letter from Johns-Manville, Bendix's asbestos supplier, put Bendix on notice.

The jury could have found that Bendix became aware of the *probable* dangerous consequences (as opposed to *known* dangerous consequences) well before 1968.  However, for purposes of this appeal, will assume the jury found that date was 1968.[23]

---

[23]    This assumption renders irrelevant Honeywell's argument that "the mere fact that Bendix took precautions against possible harms from working with asbestos in factory conditions does not support a reasonable inference … that Bendix knew of probable dangerous consequences from working with brakes that contained processed chrysotile fibers embedded in resin."  We note that Honeywell's argument is similar to the

65.

Cohen's testimony and the evidence discussed above constitutes substantial evidence that, *at a minimum*, Bendix was aware by 1968 of the probable dangerous consequences of exposure to chrysotile, such as the risk of contracting cancer. This awareness specifically relates to chrysotile because it was the type of asbestos Bendix obtained from Johns-Manville and used to manufacture brakes at its Troy facility. Consequently, we reject Honeywell's argument that Bendix was not aware of probable dangerous consequences of using *chrysotile* even if it knew other types of asbestos were hazardous to health when inhaled.

### 2.  *Failure to Avoid Probable Dangerous Consequences*

Bendix's failure to avoid the probable dangers of exposure to chrysotile was established by (1) its delay in warning the people who installed its brakes about the dangers and (2) its failure to conduct any research into the health consequences of exposure to chrysotile asbestos.

Honeywell argues Bendix did conduct research, stating that from 1971 through 1973 Bendix worked with the Environmental Protection Agency to test the amount of asbestos fibers that are released into the atmosphere from braking operations. A report of tests performed at Bendix research laboratories during that period found that 99.7 percent of the asbestos was destroyed during the braking operations and, therefore, less than three-tenths of a percent might have been emitted into the atmosphere. We reject Honeywell's argument because the research was limited to a very specific question that did not extend to health consequences[24] and, more importantly, the jury could have found

argument made by the manufacturer in *Pfeifer* about its reasonable belief "that the bonding agents in the products fully encapsulated the asbestos fibers." (*Pfeifer*, *supra*, 220 Cal.App.4th at p. 1301.) The court rejected that argument because it was not based on a proper application of the substantial evidence standard of review. (*Ibid*.) Honeywell's argument suffers from the same deficiency.

[24]    Rogers testified that he did not know if Bendix ever spent any money on the *health* effects of asbestos during any time frame. Many of the references in Tawiah's

Bendix's research into brake dust was self-serving and not credible. As a reviewing court, we must resolve questions of credibility in favor of the jury's determinations. (*Norman v. Department of Real Estate* (1979) 93 Cal.App.3d 768, 772.) Here, the report's lack of credibility is supported by the fact the report was very favorable to Bendix and was contradicted by studies referred to by Dr. Brodkin that found 20 to 50 times higher rates of residual asbestos (i.e., 6 to 15 percent) in brake dust. In sum, Bendix's purported reliance on its own incredible report did not preclude, as a matter of law, the jury from finding that Bendix was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid those consequences.

As to a prolonged failure to warn, a jury reasonably could have found that Bendix acted despicably by not placing warnings on its product packaging until 1973, five years after it became aware of the probable dangerous consequences of using chrysotile.[25] A failure to warn can amount to despicable conduct warranting punitive damages when the failure amounts to a conscious disregard for the safety of the persons to whom the warning would have been directed. (E.g. *Bankhead*, *supra*, 205 Cal.App.4th at p. 86 [prolonged failure to take adequate measure to protect people who worked with product].)

In summary, the jury could reasonably find Bendix's lack of research and its failure to include a warning on its packaging before 1973 were willful decisions that demonstrated Bendix failed to avoid the probable dangerous consequences to the people installing and removing its brakes from vehicles. Therefore, we conclude there is

---

December 1975 review of medical literature predate 1970 and, therefore, a similar type of review conducted earlier would have provided Bendix with further information about the *health* dangers of asbestos.

[25] For purposes of this discussion, we assume that the jury found Honeywell's evidence about the timing and existence of warning labels was credible. This assumption, though favorable to Honeywell, is harmless to plaintiffs.

substantial evidence in the record to support the jury's finding of malice as defined in Civil Code section 3294.

## DISPOSITION

The judgment is affirmed.  Plaintiffs shall recover their costs on appeal.


                                            _____

                                               FRANSON, J.

WE CONCUR:


_____
HILL, P.J.


_____
GOMES, J.